Appellant, James Selma Knight, was indicted by the Fall 1983 term of the Macon County Grand Jury. The indictment charged appellant with the crimes of rape in the first degree, burglary in the first degree, and theft in the first degree. A trial by jury was commenced on November 7, 1983. The jury found appellant guilty of burglary in the first degree and theft in the first degree. A mistrial was declared on the rape charge. Appellant was sentenced on December 7, 1983, as a habitual offender to life without parole in the state penitentiary. On the same date the trial court denied appellant's motion for a new trial and notice of appeal was given. This appeal follows:
 I
During the evening of June 27, 1983, the prosecuting witness (hereinafter referred to as the victim) returned to her home between 7:00 and 7:30 p.m. after attending a reception at the mayor's office. She parked her automobile in the driveway and entered her home, locking the doors behind her. She prepared a light supper and retired to her bedroom to watch television.
The victim fell asleep and the next thing she remembered was "something pouncing on me." She did not see her assailant's face, but testified that he had a male voice. The victim was blindfolded and gagged and had her hands tied behind her back. The intruder told her to stop struggling or she would get hit with a hammer. The victim was then asked where her money was and she told him it was in her purse. Thirteen dollars was taken. The victim was then "pulled up" on the bed and forcibly raped.
Afterwards, the victim was retied and the intruder asked where her car keys were. She told him they were in her purse. Sometime later the intruder left the house and the victim untied herself and contacted the police.
Upon investigation, the victim discovered that various objects had been thrown around the house, telephone lines had been *Page 333 
cut, and the contents of her purse were found in the hallway. The attacker had taken a pack of her cigarettes from the bedroom and smoked three or four cigarettes in the dining room, grinding them out on her card table cover. A peach-colored towel was missing from the bathroom. The victim's car was taken and was found the next day abandoned in a wooded area.
 II
Police authorities initially suspected one James B. Ligon, but according to Sergeant Gwethalyn Segova, his alibi checked out. The investigation then focused upon appellant after Sgt. Segova heard from her contacts on the street that appellant had had sex with someone and stolen a car. Appellant was evidently in jail on other charges when Sgt. Segova and Detective Henry Peavy decided to interrogate him. This interrogation resulted in a statement being made by appellant, which the State offered at trial as evidence of appellant's guilt. This statement constitutes the totality of the evidence against appellant.
The circumstances of the taking of this statement are clearly questionable. In view of our ultimate holding in this case, however, we do not need to decide the question of voluntariness concerning this statement. We include these facts merely to indicate the obvious weaknesses of the State's evidence, which is vital to the disposition of this case. Sgt. Segova testified, outside the presence of the jury, that she and Detective Peavy interrogated appellant for over 6 hours, beginning at 8:45 a.m. and ending at 3:10 p.m., on July 27, 1983. Sgt. Segova stated that there was no coercion or pressure put on appellant to make a statement. Appellant was informed of his Miranda rights both orally by the officers, and in a writing signed by appellant. On cross-examination she stated that appellant was possibly handcuffed to a chair the entire time of the interrogation. Her testimony was very vague and inconclusive concerning what was discussed and what events occurred during the 6 hours before the statement was taken. When asked if appellant made any other statements, she responded negatively.
Detective Peavy stated that appellant was not handcuffed the "entire time," and that he was not handcuffed to a chair. The three discussed the "complete" case. Peavy stated that so far as he knew appellant could read and write. Sgt. Segova stated that they never asked appellant if he could read or write.
Appellant testified for the limited purpose of determining the voluntariness of the statement. Appellant stated that he was handcuffed to a chair for the entire period of time, except when allowed to go to the restroom. Appellant stated that he could not read or write well, and that Detective Peavy told him how to spell everything in the statement. Appellant admitted writing the statement. Peavy admitted helping appellant spell the words, but according to Peavy, the words came from appellant.
Later Sgt. Segova testified that appellant was not handcuffed most of the time. She stated that he was handcuffed to a chair "some of the time," but that she could not remember how much. Sgt. Segova finally stated that appellant was not handcuffed when he went to the "bathroom" and when he was allowed to smoke a cigarette. Sgt. Segova also later remembered certain oral statements that appellant made prior to the written statement. The court excluded these newly remembered statements.
The trial court determined that appellant's statement was voluntary and allowed it to go before the jury. We note that this determination was made prior to the time Sgt. Segova contradicted and embellished her voir dire testimony. The statement made by appellant reads as follows (excluding all standardized printed form material):
 "Went to the house and got the car drove 2 miles Stop got out wipe hand prints off. the. car with a towel that I got from the bath room went Into the house through tue living room window took the car key from Bed room went in Batn room left the car wen I saw a Black and White police car went down thu the *Page 334 
woods tho hwy 80 this happen Jne 28, 1983."
It took appellant 25 minutes to write this statement and Sgt. Segova told the jury that it revealed two new pieces of evidence that was not known prior to the statement being taken. This new evidence was "[t]he location of the keys to the vehicle and the location of the towel." We note that the victim testified that the car keys were taken from her purse and the towel was taken from her bathroom. We find it difficult to believe that this was new evidence.
 III
A great deal of evidence was gathered at the victim's home and from the vehicle. This evidence was sent to the Department of Forensic Sciences for testing. The State introduced portions of the evidence at trial; however, the trial court instructed the jury to disregard this evidence because the State failed to prove that it was in any way connected with appellant. On the day of trial the defense filed a motion to produce, which included a request for:
 "All toxicology or forensic reports concerning this case, to include any reports which the State does not plan to admit into evidence, all fingerprint reports of the Defendant and any other persons submitted to the Department of Forensic Sciences in this case and all reports from the Department of Forensic Sciences, all reports of blood, saliva, and semen samples submitted to or received from the Department of Forensic Sciences, any reports concerning a hammer found at the crime scene, and all other reports from the Department of Forensic Sciences which relate to this case."
The trial court denied the motion, but ordered that "[a]nything that amounts to an exculpatory statement by the defendant or by any witnesses" be produced. The court also ordered the State to give appellant a copy of any toxicology or forensic report. Mr. Clyde Jones, the prosecuting attorney, represented that he did not have a copy of any toxicology or forensic report at that time. Subsequently, during the first day of trial, a report was made available to defense counsel, from the criminalist, Mr. Tellis Hudson.
On the second day of trial, defense counsel filed a second motion to produce and orally requested that the State produce any other scientific evidence of an exculpatory nature. The court inquired as to any other reports which Mr. Jones had in his possession. The record contains the following colloquy between the trial judge and Mr. Jones:
 "THE COURT: Are there any other reports scientific or otherwise that which you have any knowledge that simply are mutual insofar as the defendant's guilt or innocence is concerned?
 "MR. JONES: No, sir, the only report that I had was the one that I gave Mr. Williams a copy of.
 "THE COURT: Do you have a report from the other person to whom information was sent, the man in Montgomery?
"MR. JONES: No, sir.
"THE COURT: Is he going to testify?
"MR. JONES: I don't think so, Your Honor.
 "THE COURT: OK. And you didn't get a written report, lab results? There's a good bit of information that was sent on to him.
 "MR. JONES: Yes, sir. I only got that report yesterday evening when he got here. I wish I had had it before. As far as statements I have already given the defendant's statement. I don't think he's entitled to the other witnesses' statements.
 "THE COURT: Am I to assume from the fact that Mr. Landrum has not testified that there's nothing — that he does not add any information that would tie —
"MR. JONES: Mr. Chase talked to Mr. Landrum.
 "THE COURT: What is his name? How do you spell his name?
 "MR. JONES: Bill Landrum, William Landrum, L-a-n-d-r-u-m. And it's my understanding that the victim and defendant had the same type secretion, ANH. In my view of the case I don't see *Page 335 
how it's going to help or hurt. In my opinion at this point the bottom line proving that the defendant is connected with this case. I don't see how that evidence is going to help me or hurt, me.
 "THE COURT: In other words, it would be just non-conclusive on either direction?
 "MR. JONES: From either side. You couldn't say that he did or you couldn't say that he didn't.
 "THE COURT: Well, in view of the fact that no written report is available. And we are in the midst of the trial now and based on the information that the District Attorney's office has it would be non-conclusive either being exculpatory or tending to implicate the defendant. I don't know of anything that I could require the state to produce that would fall within the definition of what you are asking for here. I will allow you to explore it further. If there's anything else you can think of that I can consider. I've tried to ask questions to elicit any type of information that might fall within that category. I don't really know of anything."
The defense did not receive the report made by Mr. Landrum (the man in Montgomery) until after the trial had concluded. This report was far from being non-conclusive as represented by Mr. Jones.
The report filed by Mr. Landrum indicates that both appellant and the victim are A and H secretors. The report also discloses that the person who smoked the cigarettes found ground out on the victim's card table was an H secretor. As is stated in N. Bryant, An Introduction to Immunohematology, 77 (2d ed. 1982):
 "Approximately 77 per cent of U.S. whites and 75 per cent of U.S. blacks secrete watersoluble substances in saliva that have the same specificity as the antigens on their red cells. The term "secretor" refers to individuals who secrete A, B, or H substances. . . .
". . . .
 ". . . Thus the saliva of a group O secretor contains H substance, the saliva of a group A secretor contains A and H substances, the saliva of a group B secretor contains B and H substances and the saliva of a group AB secretor contains A, B and H substances. O negative (Bombay) individuals do not secrete A, B or H substances. . . ."
Appellant maintains that he was denied due process by the State's blatant suppression of exculpatory evidence which should have been produced pursuant to Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 IV
"The Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." United States v.Bagley, ___ U.S. ___, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481
(1985).
 "A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. . . . Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt."
California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 2532,81 L.Ed.2d 413 (1984).
In order to establish a Brady violation, appellant must prove: "(1) The prosecution's suppression of evidence; (2) The favorable character of the suppressed evidence for the defense; (3) The materiality of the suppressed evidence." Monroe v.Blackburn, 607 F.2d 148, 150 (5th Cir. 1979). See also Killoughv. State, 438 So.2d 311 (Ala.Crim.App. 1982), rev'd on other grounds, 438 So.2d 333 (Ala. 1983). These requirements have been fully met. It is clear that the prosecutor, Mr. Jones, received the report from Mr. Landrum during the trial and represented to the court that there was nothing exculpatory in the report. "If evidence highly probative of *Page 336 
innocence is in [the prosecutor's] file, he should be presumed to recognize its significance, even if he has actually overlooked it." United States v. Agurs, 427 U.S. 97, 110,96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). See also Robinson v.State, 405 So.2d 1328 (Ala.Crim.App. 1981). The favorable character of the evidence cannot be seriously questioned. If the guilty party who smoked the cigarettes found in the victim's house was an H secretor and appellant was an A and H secretor, it would seem that this evidence would be clearly favorable to appellant's claim of innocence. There was nothing in the record to indicate that more than one person perpetrated the instant crime.
The United States Supreme Court recently stated in Bagley, ___ U.S. at ___, 105 S.Ct. at 3384:
 "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome.
". . . .
 ". . . The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."
Additional guidance is found in Agurs, 427 U.S. at 112-13,96 S.Ct. at 2401-02:
 "[T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."
See also Watkins v. State, [1984] 751 So.2d 392 (Ala. 1984);State v. Kimberly, 463 So.2d 1109 (Ala. 1984); Bush v. State,431 So.2d 555 (Ala.Crim.App. 1982), aff'd, 431 So.2d 563 (Ala. 1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200,78 L.Ed.2d 175 (1983).
We have previously discussed in detail the statement made by appellant, which constituted the totality of the evidence against him. The statement falls far short of being a full and complete confession of the crimes charged. Given the incredibly weak nature of the case against appellant, the additional evidence sought by the defense clearly creates a reasonable possibility that had the evidence been disclosed, the result would have been different.
We can conceive of no clearer factual situation in which the State would be required to produce exculpatory evidence whether it was requested by the defense or not. See Agurs.
The State's failure to do so constituted a violation of appellant's right to due process. We hold that the trial court erred to reversal in not granting appellant's motion for a new trial.
For the foregoing reasons, this case is due to be, and it is hereby, reversed and the cause remanded.
REVERSED AND REMANDED.
All Judges concur.
 *Page 281