[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1052 
This is an appeal from the denial of a coram nobis petition. In October of 1984, Mark Smitherman was convicted for the sale of a controlled substance and sentenced to seven years' imprisonment.
At trial, the main witness for the State was Farris Springfield, a former Baldwin County undercover narcotics investigator. Springfield testified that he arranged a marijuana buy from one Thomas King on July 2, 1983, at Rick's Lounge in Gulf Shores. King owned this lounge and the defendant worked there as the head cook. Springfield gave King $50 and was told to return the next day for delivery of the drugs. When Officer Springfield returned, King told the defendant to get the marijuana. Then Springfield and the defendant went outside where the defendant retrieved a bag of marijuana from a vehicle, handed it to Springfield, and said, "Don't get caught," and "If you need more, come back."
The defendant testified in his own defense and admitted that he knew Thomas King and that he had been in Rick's Lounge on the day in question. However, he denied that he had transferred any controlled substance to Springfield. In his closing argument to the jury, the prosecutor accurately summarized the case when *Page 1053 
he stated, "It either happened or it didn't happen. Somebody's lying. And that's the bottom line on the case. Either Mr. Smitherman is lying or Farris Springfield is lying." King was tried before the defendant and was acquitted.
The defendant's conviction was affirmed by this Court without published opinion on April 23, 1985. Smitherman v. State,474 So.2d 204 (Ala.Cr.App. 1985). A writ of certiorari was denied by the Alabama Supreme Court on August 23, 1985. Thereafter, the defendant retained different counsel and in June of 1986, petitioned the Baldwin County Circuit Court for a writ of error coram nobis, claiming that he was entitled to a new trial on the grounds of newly discovered evidence, suppression by the prosecution of exculpatory material, and the ineffectiveness of trial counsel. Following an extensive hearing, the circuit court denied the writ. This appeal is from that denial.
 I Newly Discovered Evidence
The defendant argues that he is entitled to a new trial because of newly discovered evidence impeaching Springfield's credibility. For purposes of clarity, we have divided this evidence into four categories:
1. Information obtained from City of Creola Police Chief Frank Hammonds: After Officer Springfield resigned from the Baldwin County Sheriffs Office he was employed as a patrol officer for the City of Creola from June of 1984 until January of 1985. The defendant was tried during that period, on October 2, 1984.
At the coram nobis hearing, Chief Hammonds testified that he received "complaints on Officer Springfield's stopping and searching vehicles without probable cause," reprimanded Springfield twice about his conduct on routine traffic stops, and discovered that Springfield had lied on two occasions in relation to court cases.
On his employment applications for Baldwin County and the City of Creola, Springfield falsely claimed to have received specialized training in various law enforcement fields and inaccurately represented the terms of employment in prior positions.
Chief Hammonds testified that Springfield threatened to "set him up" by planting drugs in his car if Hammonds gave him a bad service rating. Hammonds was not sure whether this "threat" was made before or after Smitherman's trial.
In January of 1985, Chief Hammonds gave Springfield his choice of resigning or being fired. Springfield resigned. Then, in March of 1985, Springfield was arrested for DUI in Boaz, Alabama, and falsely represented to the local authorities that he was a Creola police officer.
2. Information from the FBI: Prior to Smitherman's trial, Springfield was the subject of an FBI investigation stemming from a complaint that he had attempted to suborn a witness in a narcotics case. FBI Agent Gerald Shockley testified that, although he later determined that there was no substance to the complaint, he formed the opinion that Springfield was not credible.
3. Information from the District Attorney: Agent Shockley testified that his doubts about Officer Springfield's truthfulness were based, in part, upon a statement made to him by Thomas B. Norton, the District Attorney of Baldwin County at the time of the defendant's indictment and trial. Agent Shockley testified that Norton stated that "he did not intend to take any cases to trial wherein Springfield was a material witness," and that "if he had had to go to trial with [Springfield], he would have dismissed the charges, but if a person was to come in and plead guilty he would go forward with it." According to Shockley, these statements were made approximately two months before the defendant's trial.
Norton testified that, before he left the District Attorney's Office, he "no longer had faith or confidence in Mr. Springfield" and that it was "totally possible" that he told Agent Shockley that he would not prosecute any more cases in which Springfield was the chief witness. Norton testified his "impression" was that this conversation occurred after he was appointed to *Page 1054 
the office of circuit judge on October 1, 1984. However, he admitted that "[w]henever that conversation took place, yes, I certainly said that."
4. Information concerning Steve Alverson: The defendant also claims that he is entitled to a new trial on the basis of the newly discovered evidence of a "deal" between District Attorney Norton and one Steve Alverson. Springfield had arrested both the defendant and Thomas King on related drug charges. District Attorney Norton had the drug charges against Alverson "dropped" when Alverson agreed not to testify against Officer Springfield at King's trial. Norton testified that Alverson was prepared to "say bad things about Farris Springfield." By "bad things," Norton meant things that he did not believe to be true at that time. Norton stated that, at that time, he did not believe that the "bad things" were true and questioned Alverson's credibility. However, because he was concerned about the jury's perception of Springfield, he made a deal to nol-pros Alverson's charges if Alverson would agree not to testify against Springfield in King's trial.
Apparently, for it is not clear from the record, the "bad things" in Alverson's testimony concerned Springfield's abuse of alcohol and drugs and his entrapment tactics. Norton stated that this agreement was not an attempt to prevent "the truth from coming out about the undercover agent, Mr. Springfield."
In denying the coram nobis petition, the circuit court judge entered the following written order:
 "This writ has been presented to the Court on testimony taken ore tenus, affidavits, evidence introduced and arguments and briefs of the attorneys. The Court finds that most of what is claimed to be newly discovered evidence was generally known by the attorneys who were representing the three defendants, Mark Smitherman, Steve Jones and T.K. King, prior to the trials of these three defendants; that the two cases tried by this court which were Mark Smitherman and Steve Jones, the character of Farris Springfield was attacked on the basis of his frequent use of narcotics and alcohol. Much of the newly discovered evidence testified to by Chief Hammond of the Creola Police Department occurred subsequent to the trial of October 2, 1984 and was based upon the Chief's testimony alone. Its admissibility in the trial would be doubtful. Practically all of the testimony concerning newly discovered evidence and the attack on the character of Farris Springfield came from defendants and parties who he had arrested during his undercover work with the Baldwin County Sheriffs Office and the attorneys who represented those defendants.
 "The statement made by the former District Attorney Tom Norton to Special Agent Shockley of the F.B.I. did not reveal the basis of the District Attorney's statement concerning the credibility of Springfield nor did Shockley reveal from his investigations any matters which would have affected the credibility of Springfield.
 "In regards to the alleged negotiated settlement with Steve Alverson and his attorney E.E. Ball, the Court is of the opinion that even if Alverson had testified as suggested, it would only have been cumulative testimony presented at the trial and would not have influenced the jury verdict.
 "The Court finds that Mark Smitherman was adequately represented during the course of his trial.
 "There were witnesses who testified to the good character of Springfield and his excellent investigatory abilities including Special Agent Roberts of the F.B.I. who had worked with him and a District Attorney from North East Alabama who was familiar with his work in that area as a law enforcement officer. Springfield's military record was introduced which revealed that he was a good soldier and that he had received several commendations for his work in law enforcement."
This order is due to be affirmed for the following reasons: *Page 1055 
The rules regarding whether alleged newly discovered evidence entitles a petitioner to a new trial are strict and exacting. In order to receive a new trial the petitioner must show: "(1) That the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since trial; (3) that it could not have been discovered before trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching." Taylor v. State, 266 Ala. 618, 620, 97 So.2d 802,804 (1957); Bland v. State, 390 So.2d 1098, 1101-01
(Ala.Cr.App.), cert. denied, Ex parte Bland, 390 So.2d 1109
(Ala. 1980), cert. denied, 451 U.S. 991, 101 S.Ct. 2332,68 L.Ed.2d 851 (1981); Young v. State, 346 So.2d 509, 514
(Ala.Cr.App. 1977). See also Siniard v. State, 491 So.2d 1062,1064-65 (Ala.Cr.App. 1986); Lassiter v. State, 38 Ala. App. 287,290, 83 So.2d 365, 368, cert. denied, 263 Ala. 618,83 So.2d 369 (1955). "In cases of this character much must be left to the sound discretion of the trial court." Slaughter v. State,237 Ala. 26, 27, 185 So. 373 (1938).
Although the first requirement — "that the evidence is such as will probably change the result if a new trial is granted" — is phrased in terms of evidence adduced in the event of a retrial, it is clear that the newly discovered evidence must have been in existence, though not known, at the time of the original trial, and must have been capable of changing the result of the first trial. The requirement is better phrased, for purposes of the instant case, as follows: That the evidence, had it been admitted, would probably have changed the result of the original trial. See Cannon v. State, 53 Ala. App. 509,518, 301 So.2d 272 (1974) ("[W]e doubt that such would have changed the result of trial").
The four categories of evidence in this case do not qualify as "newly discovered" for two reasons. First, much of the alleged newly discovered evidence learned from Police Chief Hammonds fails to satisfy this first "in existence" requirement. There is either no showing that the events occurred prior to October 2, 1984, the date of the defendant's trial, or the record clearly reflects that the events happenedafter October 2, 1984. "In coram nobis proceeding, the petitioner bears the burden of presenting satisfactory proof of his claim." Ex parte Lawley, 512 So.2d 1370 (Ala. 1987);Boatwright v. State, 494 So.2d 929, 932 (Ala.Cr.App. 1986).
Second, the remainder of the defendant's claimed newly discovered evidence fails to satisfy the admissibility requirement of the newly-discovered evidence test. "[T]he new evidence must be admissible under the established rules of evidence. 'The trial court will not, of course, be put in error for refusing a new trial because of newly discovered evidence when such evidence would not be admissible upon a retrial of the cause.' " Prince v. State, 356 So.2d 750, 751 (Ala.Cr.App. 1978). "A new trial should not be granted on this ground when it does not appear that the facts offered to be proved could successfully be offered in evidence on another trial." Lassiterv. State, 38 Ala. App. at 290, 83 So.2d at 368. See Houston v.State, 208 Ala. 660, 663, 95 So. 145, 147 (1923); Law v. State,407 So.2d 572, 575-76 (Ala.Cr.App. 1981).
None of the testimony regarding complaints received or reprimands given by Chief Hammonds to Springfield, lies to the circuit judge, threats, or falsified employment applications by Springfield would have been admissible, either on cross-examination of Springfield himself, see 3A Wigmore,Evidence § 987 n. 1 at 866 (Chadbourn rev. 1970), or as extrinsic evidence from other witnesses at the defendant's trial. Id. at § 979.
 "One may impeach a witness' credibility in one of two ways: (1) by showing his bad general reputation in the community or (2) by showing his bad general reputation for lack of truth and veracity. . . . A witness may not testify that he would not believe another under oath unless he has first testified to such other's bad general reputation as a whole or with respect to truth and veracity." C. Gamble, *Page 1056 McElroy's Alabama Evidence § 140.01(1) at 289 (3d ed. 1977).
* * * * * *
 "A witness may not be impeached by another's testimony as to specific bad acts of the witness which have no relevancy except as tending to show the witness's bad character." Id. § 140.01(9) at 293.
* * * * * *
 "A witness may not be cross-examined for impeachment as to specific acts of misconduct by him which have no relevancy except as tending to show that he is a person of bad character as a whole or with respect to truth and veracity." Id. at § 140.01(10).
"When a witness denies that he is biased toward a party, . . . independent evidence of the bias revealing facts, statements, or relationships may be introduced." C. Gamble, McElroy'sAlabama Evidence § 149.01(4) (3rd ed. 1977). Although a witness may be impeached by proof of specific acts showing his bias, partiality, or motive to testify falsely, see Davis v. Alaska,415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed. 2d 347 (1974); 3A Wigmore, § 940, the "attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues orpersonalities in the case at hand." 415 U.S. at 316,94 S.Ct. at 1110.
 "Three different kinds of emotion constituting untrustworthy partiality may be broadly distinguished — bias, interest, and corruption:
 "Bias, in common acceptance, covers all varieties of hostility or prejudice against the opponent personally or of favor to the proponent personally.
 "Interest signifies the specific inclination which is apt to be produced by the relation between the witness and the cause at issue in the litigation.
 "Corruption is here to be understood as the conscious false intent which is inferrible from giving or taking a bribe or from expressions of a general unscrupulousness for the case in hand." 3A Wigmore, § 945 at 782 (emphasis in original).
Although evidence that Springfield overstepped the bounds of the law in other drug cases and that he threatened to "plant" narcotics in his superior's car may have pointed to a general bad character on Springfield's part, it did not show a bias against the defendant personally or a conscious false intent to "set him up" in the instant case. At trial, the defendant denied that he had participated in a drug transaction; his defense was simply that Springfield was mistaken. He never claimed that Springfield was "out to get him" or to "set him up," and he could not answer the State's question on cross-examination as to why Springfield would have "made up" a story implicating him in a drug sale. Under the circumstances, even the most damning of the alleged newly discovered evidence would have been inadmissible at trial because, though it might have discredited Springfield's moral charactergenerally, it did not show a personal bias or a particular corrupt intent toward Smitherman.
 "In considering the various modes by which the credit of a witness may be assailed, courts must observe the distinction between an attack upon his general credit, and an attack upon his credit in the particular case. Particular facts cannot be given in evidence to impeach his general credit only, but may be to affect his particular credit — that is, his credit in the particular case." McHugh v. State, 31 Ala. 317, 320 (1858) (State's witness may be impeached by proof of acts and declarations evidencing hostility toward accused).
For purposes of impeachment, "there is a difference between general credibility and answers which might possibly establish untruthfulness with respect to the specific events of the crimecharged" United States v. Garrett, 542 F.2d 23, 26 (6th Cir. 1976) (emphasis added) (officer's suspension from police force for suspected use of drugs may have given him a personal interest in outcome of prosecution of accused *Page 1057 
for distribution of narcotics). See also Ex parte Turner,545 S.W.2d 470, 475-76 (Tex.Cr.App. 1977) (protection of informant may have given police officer a motive to testify falsely in drug case). The trial court did not err in denying the petition on the ground of newly discovered evidence.
 II Failure to Disclose Exculpatory Evidence
The defendant also claims that he is entitled to a new trial under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963), because the State failed to disclose to him the information we have summarized in categories 2, 3, and 4 in Part I of this opinion: the FBI investigation, the District Attorney's significant doubts about Springfield's credibility, and the dismissal of the charges against Alverson in exchange for his silence against Springfield.
In order to establish a Brady violation, the defendant must prove: "(1) The prosecution's suppression of evidence; (2) the favorable character of the suppressed evidence for the defense; and (3) the materiality of the suppressed evidence." Monroe v.Blackburn, 607 F.2d 148, 150 (5th Cir. 1979), cert. denied,446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980). See Moore v.Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972);Knight v. State, 478 So.2d 332, 335 (Ala.Cr.App. 1985);Killough v. State, 438 So.2d 311, 316 (Ala.Cr.App. 1982), reversed on other grounds, Ex parte Killough, 438 So.2d 333
(Ala. 1983).
Here, it is clear that the evidence outlined in categories 2 and 3 above was clearly favorable to the defense. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173,1177, 3 L.Ed.2d 1217 (1959). In United States v. Bagley,473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court held that "impeachment evidence. . . as well as exculpatory evidence, falls within the Brady rule" of required disclosure. 473 U.S. at 676, 105 S.Ct. at 3380. See also Gigliov. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104
(1972).
However, the prosecution's failure to disclose information that could have been helpful to the defense in conducting cross-examination "amounts to a constitutional violation only if it deprives the defendant of a fair trial. . . . [A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678, 105 S.Ct. at 3381. The Bagley
Court defined "materiality" in the following terms:
 "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. at 682, 105 S.Ct. at 3384.
The Supreme Court has not enumerated what factors should be considered in determining whether the evidence is material. See Comment, "The Prosecutor's Duty to Disclose: FromBrady to Agurs and Beyond," 69 J.Crim.L. Criminology 197, 205 (1978). Specifically, the Court has never determined whether, in order to mandate a new trial for the accused, the nondisclosed information must have been admissible in evidence. "Unfortunately, a majority of the Supreme Court has never directly addressed this issue so that no general rule exists as to how to treat favorable but inadmissible evidence." Comment, 69 J.Crim.L. Criminology at 210.
However, contrary to the defendant's argument, there is a substantial body of case law which treats admissibility as a controlling factor in the determination of whether the exculpatory information is material. See W. LaFave,Criminal Procedure § 19.5(d) (1984); Comment, 69 J.Crim.L. *Page 1058 
Criminology at 210 n. 183 (1978). In addition, there is at least one Alabama case which indicates, in dicta, that claimedBrady material must have "some evidentiary value" in order to be subject to required disclosure. See Rupert v. State,374 So.2d 451, 453 (Ala.Cr.App. 1979) (newspaper article and police report inadmissible hearsay). Compare Evans v. State,338 So.2d 1033 (Ala.Cr.App. 1976), cert. denied, Ex parte Evans,348 So.2d 784 (Ala. 1977) (disclosure of deceased inmate's "prison jacket" not mandated since information allegedly contained therein, even if it existed, would have been inadmissible);Rogers v. State, 332 So.2d 739, 745-46 (Ala.Cr.App.), cert. denied, 332 So.2d 746 (Ala. 1976) (In upholding the denial of a motion to produce the medical records of the prosecutrix covering a time prior to the alleged rape, the court noted that, "Documents are not subject to inspection for the mere reason that they will be useful in supplying a clew whereby evidence can be gathered. Documents to be subject to inspection must be evidence themselves.").
 "The failure of the Supreme Court to provide guidance on the issue of admissibility has created widely divergent views in the lower courts.
 "Some courts and commentators, relying on the Supreme Court majority opinions in which the contested evidence was either found to be admissible or assumed to be so, have inferred therefrom a requirement that unless the evidence is admissible, it need not be disclosed. . . .
 "At the other extreme, some courts, . . . have rejected admissibility entirely as even a factor to consider in determining materiality. . . .
 "Still other courts, instead of completely rejecting the admissibility requirement, have retained it in a highly modified form. Some have required the prosecutor to disclose inadmissible evidence only if it could logically lead to the discovery of admissible evidence. . . .
 "Among these divergent views, the best rule seems to be the latter, for it most closely accords with the tenor of the Agurs [and Bagley] opinion[s]. Obviously, an airtight rule eliminating the duty to disclose if the evidence is inadmissible is too harsh on the defendant. There will likely be times when favorable though inadmissible evidence could, through investigation, blossom into vital admissible defense evidence. In such a case, the inadmissibility of the initial evidence should not bar its disclosure.
 "On the other hand, a disclosure rule completely eliminating consideration of admissibility of the evidence would be too harsh on the prosecutor and inconsistent with the Agurs [and Bagley]
opinion[s). Favorable evidence if it is inadmissible and could not lead to admissible evidence can have no effect on the jury. . . ."Comment, 69 J.Crim.L. Criminology at 210-11. See also W. LaFave, Criminal Procedure, § 19.5(d) at 542-43 (1984).
There is no question that the doubts about Springfield's veracity entertained by Agent Shockley and then-District Attorney Norton would have affected the credibility of Springfield as a witness if such evidence had been submitted to a jury. The question before us, however, is whether that information — or evidence derived from that information —could have been presented to a jury in the form of admissible evidence, for, if not, then there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley,473 U.S. at 682, 105 S.Ct. at 3380.
As we have pointed out in Part I, the credibility of a witness may be impugned by showing either his bad reputation generally or his bad reputation for the particular traits of truth and veracity. The personal opinions of Agent Shockley and District Attorney Norton that Springfield was untruthful would have been inadmissible, see Glover v. State, 200 Ala. 384, 385,76 So. 300 (1917), and neither man could properly have stated that he would not believe Springfield under oath unless he had first testified to Springfield's bad reputation. McElroy at § 140.01(1) at 289.
At the hearing on the coram nobis petition, there was no direct testimony from *Page 1059 
Shockley or Norton that either man knew Springfield's general reputation or reputation for truth and veracity. Each man merely testified to his personal doubts about Springfield's credibility. "[T]he witness' testimony will be excluded if his knowledge of the person's general reputation is based upon his own personal knowledge of the person's character rather than upon what the community thinks of the person." McElroy at § 26.02(11). "When character is in issue, individual opinions are, in general, not competent to be given to the jury." Davev. State, 22 Ala. 23, 39 (1853). While it can be argued that the disclosure of the personal opinions of Shockley and Nortoncould have led to the discovery of admissible reputation evidence, this was not established at the coram nobis hearing.
The information regarding Springfield's having been "investigated" by the FBI does not pass the materiality test. The information was neither admissible nor capable of leading to admissible evidence.
Notwithstanding dicta to the contrary in Simpson v. State,465 So.2d 472, 474 (Ala.Cr.App. 1984), cert. denied, Ex parteState, 465 So.2d 474 (Ala. 1985), the fact that a witness has been "investigated," "arrested," "charged," or "indicted" is inadmissible to impeach him. See McElroy at § 140.01(8). "A short-hand way of stating this rule is that a witness cannot be impeached by proving prior criminal acts which terminate in less than a conviction." Id. at 292.
The information of District Attorney Norton's nol-prossing the charges against Steve Alverson in return for Alverson's agreement not to testify against Springfield in another case was, to begin with, not necessarily favorable to the defendant because it was not equivalent to Norton's suppressing evidence. See generally 2 Wigmore at §§ 277-78. At the hearing on the coram nobis petition, Norton testified that at the time of Alverson's proposed testimony, he did not believe Alverson. Just because Norton wanted to insure that Springfield, in whom he then had faith, was not discredited before the jury does not mean that he engaged in misconduct. It could have been shrewd trial strategy. "It is within the sound discretion of [a prosecuting attorney] to determine which cases shall be brought against which defendants; in the absence of overreaching ordeceit . . . it is an entirely proper use of that discretion where, in the opinion of the [prosecuting attorney] an inculpated party's aid in other matters outweighs the benefits of his prosecution." United States v. Crisona, 440 F. Supp. 24,26 (S.D.N.Y. 1977) (emphasis added). The Norton-Alverson agreement was inadmissible because, even if it could be shown that Springfield himself participated in the District Attorney's effort to prevent adverse testimony from being presented against him, and the information might thereby have discredited Springfield, see 2 Wigmore at § 278, "[i]t suffices to point out that the essential discrediting element is a willingness to obstruct the discovery of the truth by manufacturing or suppressing testimony." 3A Wigmore, § 956 at 803. On the record before us, we cannot find that the Norton-Alverson agreement arose because of a willingness to obstruct the truth. The most that can be said of this agreement is that it supports the inference that Springfield's reputation was bad. Had defense counsel known of the Norton-Alverson agreement he could have interviewed Norton, Alverson, or Alverson's attorney, but the only admissible evidence he could have gained thereby was that Springfield had a bad reputation generally or a bad reputation for truth and veracity.
Because all of the specific instances of Springfield's misconduct resolve into a single admissible item — reputation — we must now decide the question left unanswered at the beginning of Part II — whether it can be said that the prosecution "suppressed" this evidence. Ordinarily it is illogical to speak in terms of "suppressing" evidence of reputation. Since reputation is, by definition, a matter of knowledge or opinion shared by the community, Watson v. State,181 Ala. 53, 61 So. 334 (1913), it would be incongruous to find that the State could suppress that which was generally *Page 1060 
believed. On the record before us, this observation is particularly apt since there was ample testimony that defense counsel was aware of Springfield's bad reputation among thoseaccused of drug offenses and their attorneys. In fact, it was clearly established at the coram nobis hearing that defense attorneys representing those charged with Baldwin County drug offenses wherein Springfield was the prosecuting witness regularly met with each other, traded adverse information about Springfield, and tried to organize common defense strategies. They sat in on each other's trials and took notes of inconsistencies in Springfield's testimony. Convicted drug dealer Steve Jones even testified at the coram nobis hearing that the defense attorneys and clients who met together regularly to discuss Springfield had "a good idea" that Steve Alverson had been promised a deal if he refused to testify against Springfield, but their suspicions were not confirmed until after their trials. See Jones v. State, 521 So.2d 1063
(Ala.Cr.App. 1987).
In Geeslin v. State, 505 So.2d 1242, 1245 (Ala.Cr.App.), reversed, Ex parte Geeslin, 505 So.2d 1246 (Ala. 1986), cert. denied, ___ U.S. ___, 107 S.Ct. 1974, 95 L.Ed.2d 814 (1987), this Court quoted United States v. Brown, 582 F.2d 197, 200 (2d Cir. 1978), for the following proposition:
 "Under Brady, the Government may not withhold material exculpatory evidence specifically requested by the defense. . . . However, where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a Brady violation by not bringing the evidence to the attention of the defense." (Emphasis added.)
We also cited United States v. LeRoy, 687 F.2d 610 (2d Cir. 1982), cert. denied, 459 U.S. 1174, 103 S.Ct. 823,74 L.Ed.2d 1019 (1983), and United States v. Ruggiero, 472 F.2d 599, 604
(2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772,37 L.Ed.2d 398 (1973), which proceed on the assumption that, "The rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant would not be denied access to exculpatory evidence only known to the Government." UnitedStates v. LeRoy, 687 F.2d at 619. The facts developed at the evidentiary hearing on the coram nobis petition demonstratewithout a doubt that Springfield's bad reputation was not "only known to the Government." Compare Ex parte Geeslin,505 So.2d 1246, 1248 (Ala. 1986) (testimony concerning whether defense was aware of exculpatory material was controverted). The defense was aware of Springfield's bad reputation among certain segments of Baldwin County, and it was not entitled to prove his reputation among any one particular segment. See Watson v.State, 181 Ala. 53, 61 So. 334, 335 (1913) (not error to exclude testimony as to how accused "stood with law abiding people"). Consequently, we find no evidence that the prosecution "suppressed" evidence.
In connection with issues I and II of this opinion, it is significant to note that, while Springfield was the only eyewitness to involve the defendant in the actual sale of marijuana, he was not the only witness to incriminate him. At the defendant's trial, Sheriff's Office Investigator Lance Monley testified that he went with Springfield to inform the defendant that there was a warrant for his arrest. Monley stated that, on that occasion, the defendant "recognized Deputy Springfield right off the bat," and that the defendant stated, "I expected you all sooner or later." When asked to cooperate and help identify others involved in narcotics, the defendant "showed some interest," and stated that he wanted to talk to his attorney. Monley testified that the defendant never denied that he was involved in the transaction involving Springfield on July 2nd, and that he indicated that he knew that was the particular transaction for which he was going to be arrested.
Although implicit in the defendant's arguments is the suggestion that the prosecutor knowingly used perjured testimony to obtain a conviction, the record contains no evidence of bad faith on the *Page 1061 
part of the District Attorney. However, we caution prosecutors that "bad faith may be shown where a prosecuting attorney has reason to doubt the validity of the charges, fails to exercise independent judgment in continuing a prosecution, or where the complaining witness has insufficient evidence to support his allegations." In re Allman, 43 B.R. 840, 848 (D.Colo. 1984);Matter of Davis, 691 F.2d 176, 179 (3d Cir. 1982).
For the reasons stated, we find that the coram nobis petition on the ground of the State's failure to disclose impeaching evidence was properly denied.
 III
The defendant argues that the State's failure to disclose the impeaching evidence, coupled with the failure of defendant's trial counsel to discover impeachment evidence from other sources and present it at trial, denied the defendant his constitutional right to the effective assistance of counsel. We disagree.
At the coram nobis hearing, defense counsel Charles Kenneth Slade, Jr., testified that, among other things, he "coordinated and discussed the series of cases involving Mr. Springfield with each and every attorney that I was able to determine was defending a client on similar charges that were brought by Mr. Springfield." He stated that, at the defendant's trial, he did not "directly" call any witnesses to impeach Springfield's general reputation. Slade testified:
 "One of the interesting aspects of Mr. Springfield's testimony was that there had been so much of it in regard to this particular case, that most of the inconsistencies regarding this particular case, not just his general background, but this particular case, were evidence from prior transcripts.
 "He would say one time one thing on the record, under oath, and then, before you know it, he would say another thing in another case.
 "I made a comparison between all of these transcripts. It was obvious that he had changed his testimony a number of times somewhat."
In reviewing this appeal, we have examined the record of the defendant's trial. That transcript shows that Slade used transcripts of Springfield's prior testimony in other cases to impeach his testimony at the defendant's trial. Also, defense witnesses directly contradicted Springfield's account of the events and circumstances surrounding the sale of marijuana.
At trial, Thomas King, who had previously been acquitted in a related prosecution, testified as a defense witness. King stated that he never asked the defendant to deliver any controlled substance to agent Springfield. On cross-examination by the prosecutor, King testified that Springfield had "lied" about the defendant and "several other people." He stated that Springfield "is an alcoholic. He was deranged. He had no business being a police officer."
At the coram nobis hearing, several witnesses vouched for Springfield's credibility. Richard Igou, the District Attorney for the Ninth Judicial Circuit (Cherokee and DeKalb counties), testified that, at one time, Springfield was employed by the DeKalb County Sheriff's Office and that he "did as good or better work than any undercover agent that we have ever had working that area during the time that he was there." FBI Special Agent Paul R. Roberts testified that he had worked with Springfield and had "no doubts" about his credibility. Baldwin County Chief Assistant District Attorney Greer Minic testified that prior to the defendant's trial, she had never been furnished with any information that caused her to question Springfield's credibility. Baldwin County Sheriff Thomas H. Benton testified that he hired Springfield as an undercover agent based on the recommendation of FBI Agent Roberts, and that he never received any information that caused him to be concerned about Springfield's performance or credibility. Sheriff's Office Investigator Lance Monley testified that he never received any information prior to the defendant's trial that caused him the slightest concern about Springfield's credibility. *Page 1062 
Under the standards enunciated in Strickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Alabama Supreme Court in Ex parte Baldwin,456 So.2d 129 (Ala. 1984), affirmed, 472 U.S. 372, 105 S.Ct. 2727,86 L.Ed.2d 300 (1985), we find that the circuit court properly found that the defendant was not denied his constitutional right to effective assistance of counsel.
First, there has been no showing that counsel's representation fell below an objective standard of reasonableness. The record shows that Slade did investigate Springfield's credibility and that he chose to attack that credibility through the use of Springfield's prior testimony rather than through "direct" impeachment witnesses. "[S]trategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 104 S.Ct. at 2066; Dill v.State, 484 So.2d 491, 496 (Ala.Cr.App. 1985). Additionally, most of the defendant's "newly discovered evidence" of Springfield's reputation was not even in existence at the time of the defendant's trial.
Second, there has been no showing that any deficient performance by counsel "prejudiced defendant, which requires a showing that a different outcome of the trial probably would have resulted but for counsel's allegedly ineffective performance." Ex parte Lawley, 512 So.2d 1370 (Ala. 1987).
Even assuming, arguendo, that defendant's counsel erred and that this error was professionally unreasonable, that would not in and of itself warrant setting aside the judgment of a criminal proceeding if the error did not affect the judgment.Strickland, supra, 466 U.S. at 691, 104 S.Ct. at 2066. The defendant must affirmatively prove prejudice; that is, he "must show that there is a reasonable probability, that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, supra, 466 U.S. at 694,104 S.Ct. at 2068. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "Strickland, supra, 466 U.S. at 689, 104 S.Ct. at 2065.
We are not convinced that had Springfield's testimony been impeached more thoroughly, a different outcome of the trial probably would have resulted. Even with Springfield's credibility impeached, there remains Investigator Monley's testimony of the incriminating statements of the defendant when informed of the arrest warrant.
This Court has critically examined and reexamined the issues and evidence presented. We have reviewed not only the record of the coram nobis proceedings but also the record of the defendant's trial. Our review convinces us that the judgment of the circuit court denying the coram nobis petition is due to be affirmed.
AFFIRMED.
All Judges concur.