Timmy Baker was charged in separate indictments for selling, furnishing, or giving away marijuana and cocaine, in violation of § 20-2-70, Code of Alabama 1975. These cases were consolidated for trial and the jury found the appellant "guilty as charged" in each case. Following a sentencing hearing the trial judge sentenced appellant under the split sentence act to one year in the penitentiary and three years on probation. Appellant was further ordered to pay restitution to the State in the amount of $200. Motion for new trial was filed and denied, hence this appeal.
Allen Adair testified that he was employed by the Alabama Department of Forensic Sciences. On December 28, 1983, N.W. Ward of the Montgomery County Sheriff's Department turned over a sealed envelope containing a clear plastic bag with plant material within same. The plant material was tested by Adair and he determined such to be one-half ounce of marijuana. Adair identified the bag and marijuana tested by him at trial.
Adair was given another exhibit to test on January 6, 1984, by N.W. Ward. This exhibit was a plastic bag containing white powder. Adair tested this substance and such tests revealed it to be nine-tenths of a gram of cocaine. Such exhibit was given to him sealed in an envelope and he identified the substance and envelopes at trial as those which were given him by Ward.
Grady Gibson testified that he was employed as a narcotics agent by Alabama Bureau of Investigation. On December 26, 1983, at approximately 2:00 p.m., Gibson and one Eddie Hart (a contract agent working for ABI) drove to the appellant's home on Garden Street in Montgomery. When they arrived at the residence, the appellant came outside to the car to speak to them. Gibson stated that he told appellant that someone had referred him to appellant about the possibility of his getting some marijuana and cocaine for him. Appellant told Gibson that he had dealt in the past and still had some dealings and that he would be able to help Gibson. Appellant further told Gibson that he did not have anything at that time but to come back around 8:00 p.m.
Gibson and Hart returned to appellant's home at the appointed time and appellant again met them at Gibson's car in the driveway. Gibson asked the appellant if he had either the marijuana or cocaine. Appellant responded that he did not have it at that time, but his neighbor would go get some marijuana for Gibson. Gibson, Hart, and the appellant were to follow his neighbor's car out to the vicinity where the neighbor was to pick up the marijuana. Appellant stated that they would park their car and his neighbor would go get the marijuana and return to them. Appellant then walked across the street and spoke to a man and returned to Gibson saying it was time to go.
Gibson, Hart, and appellant then followed a 1970 green colored Plymouth to a nightclub on the corner of the Troy Highway and Bell Road in Montgomery. They parked in the parking lot of this club and waited for the green Plymouth to return. When the Plymouth car returned, the appellant exited Gibson's car and walked over to the Plymouth. Gibson saw the driver of the car hand appellant a plastic bag. Appellant brought the plastic bag to Gibson's car and handed it to Gibson. Gibson then gave the appellant $80. Gibson then told the appellant that he would get back in touch with him again because he still wanted some cocaine. Appellant replied that it would be no problem. Appellant then walked over to the green Plymouth car, got in, and drove away.
Gibson and Hart then drove to the narcotics office where they handed the plastic bag containing marijuana to Investigator Ward of the Montgomery County Sheriff's Department. Gibson further testified that Ward had been following them all night and observed all activity from a safe vantage point. *Page 499 
On January 5, 1984, at approximately 1:00 p.m., Gibson phoned the appellant and said he would like to get some cocaine. Appellant told Gibson that he would be glad to get some for him and to come by his (appellant's) house around 4:30 p.m. At approximately 4:30 p.m., Gibson and Hart drove to the appellant's house. Upon arrival at appellant's home, Gibson was informed by appellant that he did not have the cocaine at that time and they would have to go pick it up. Gibson, Hart, and appellant then drove to a convenience store on the Wetumpka Highway. Gibson and Hart got out of the car, gave appellant $120, and appellant drove away. Approximately fifteen minutes later the appellant returned. He gave Gibson a plastic bag with white powder in it. Gibson and Hart then took the appellant back to his house. Gibson then drove to the narcotics office and gave this evidence to Investigator Ward, who had once again been following the action.
During his testimony, Investigator Gibson identified the marijuana and cocaine which had earlier been marked into evidence as that which was given to him by the appellant in this cause.
N.W. Ward testified that he was an investigator employed by the Montgomery County Sheriff's Department. He was assigned to work with the ABI during their undercover drug operations. On December 26, 1983, he was assigned to be a back-up for Investigator Gibson. He followed Gibson and Hart over to the appellant's house in the early afternoon. They stayed a short while then left. Later that night, Ward again followed Gibson and Hart to the appellant's house. Appellant got in the car with Gibson and they drove to "The Limit." Gibson parked in the parking lot. After about fifteen minutes an older model Plymouth car pulled into the parking lot beside Gibson's car. Appellant got out of Gibson's car, walked around to the passenger side of the Plymouth, came back to Gibson's car and handed Gibson something. Appellant then went back to the Plymouth car, got in, and they left. Ward then followed Gibson and Hart to the narcotics office, where he was given a plastic bag of marijuana by Gibson. Ward identified the marijuana introduced earlier and stated that it was the same that was given Gibson initially and then him. Ward retained possession of this marijuana until he turned it over to the Department of Forensic Sciences.
Ward testified that on January 5, 1984, he followed Gibson and Hart over to appellant's house. Appellant entered the car and they drove to a convenience store. Gibson and Hart then got out of the car and appellant drove to Rigby Street. Appellant went into a residence and then came back out, got in the car and drove to the convenience store. Appellant stopped the car, got in the back seat and Gibson and Hart got back in the car. They then drove back to appellant's residence where appellant got out of the automobile. Gibson and Hart then drove to the narcotics office, where they gave Ward a package with a white powdery substance in it.
Ward identified a plastic bag containing a white substance as that which was given to him by Gibson. He turned this substance over to the Alabama Department of Forensic Sciences.
The appellant called Eddie Hart to the stand as an adverse witness. Hart's testimony corroborated the testimony given earlier by State witnesses Gibson and Ward. Under examination, Hart denied having met the appellant prior to December 26, 1983.
Anita Baker testified that she had seen Eddie Hart at the appellant's house on numerous occasions. She testified that her husband was the man who drove to get the marijuana for appellant on December 26, 1983. She stated that she went with her husband on that night. They told appellant and the others to stay at "The Limit" while they went to get the marijuana. Upon their return to "The Limit," appellant got in the car with them and was given the marijuana. Appellant then got back in the car with the other men and left. She and her husband proceeded home, and, upon *Page 500 
arrival, appellant ran over to them and said that Gibson and Hart had given him half a bag of marijuana.
Appellant testified that prior to December 26, 1983, he had not known Gibson. He also stated that Gibson has never called him on the telephone. He met Eddie Hart in early December at a party. The following day Hart and one Kevin Booth came to his house and Hart asked appellant to sell him some drugs. Hart came over to appellant's house "three or four times a day" wanting to buy some drugs.
On December 26, 1983, Hart alone came over to appellant's house at approximately 3:30 p.m. Appellant told Hart to call back around 7:00 or 8:00 p.m. Hart called him that night and the appellant told him that a friend could get him some marijuana. Hart told appellant on the telephone that he was going to bring his cousin with him to get the marijuana. That night was the first time appellant had seen Gibson. Hart and Gibson gave him $80, which appellant gave to his friend. They then drove out to "The Limit" and waited for appellant's friend to bring the marijuana. When appellant's friend returned, appellant walked over to his car and got a bag of marijuana from him. He then walked back to Hart and Gibson, gave the bag of marijuana to Hart, got in the car with them and they drove off. On the way back to his house they smoked a couple of "reefers." They then gave him about a quarter of an ounce of the marijuana before they dropped him off at his home.
Gibson and Hart came over to his house another time and wanted him to get some cocaine for them, but he refused. On January 5, 1984, Hart asked him again to get him some cocaine. Hart, Gibson, and appellant drove to a convenience store, then appellant drove and picked up some cocaine and went back to get Hart and Gibson. Hart and Gibson then took appellant home.
The State called Grady Gibson as rebuttal witness. He stated that during the months of December and January he worked with Eddie Hart two or three times a week. He stated that from the actions of the appellant and Hart he couldn't tell if they knew one another as friends or not. He further stated that the conversations on the dates in question were between himself and appellant.
 I
Appellant argues that the trial court's demeanor prejudiced the defendant in this cause. He specifically argues that the court abused its discretion in polling the jury on such matters after granting a mistrial and alleges that the court allowed the jury to decide if a mistrial should be granted.
The record on this point reads as follows: (R. 148-158)
"THE COURT: Make your objection.
"MR. BELL: With all due respect to the Court, which I have great respect for, I must make an objection to the demeanor in which Your Honor is trying this case on my behalf. Whether you realize it or not, you have made certain facial expressions and certain — even remarks and also gestures that might be misleading and misconstrued by the jury as if either I am a fool or an idiot up here or I don't know what I am doing and so forth. It might be possible they might take it that you feel that this is all a farce on the part of — on the behalf of the Defendant pleading not guilty because of the doctrine of entrapment. And I just felt that I had to do it because this has happened on one or two other occasions.
"THE COURT: Well, how about doing for me what I asked you for and get me the photostatic copies of the cases in which you intend to rely on your charges twenty, twenty-one, twenty-two, twenty — twenty, et seq. All right. Bring the jury back, please sir.
"MR. BELL: May I have a ruling on my objection?
"THE COURT: I sustain your objection.
"MR. BELL: At this point, Your Honor, then I would ask for a mistrial.
"THE COURT: All right. I grant your motion for a mistrial. We'll try this case *Page 501 
again in the morning. Wait just a minute. I am going to ask the jury about this before I do it. (At this time, the following was had and done of record in the presence of the Jury.)
"THE COURT: Ladies and gentlemen, there has been a motion made for a mistrial motion based on the Court's conduct in this case. And I am going to ask you if any of you-all have any idea that I have got any feelings in this case about what the facts show or what the facts do not show. Do you, sir?
"A JUROR: No.
"THE COURT: Is there anything that I have said or done or any facial expressions indicated to you that the Court has got any feelings at all about whether this man is guilty or not?
"A JUROR: Not from my —
"THE COURT: Sir?
"A JUROR: No.
"THE COURT: Ma'am?
"A JUROR: No.
"THE COURT: Ma'am?
"A JUROR: No.
"THE COURT: Ma'am?
"A JUROR: No.
"THE COURT: Sir? Ma'am?
"A JUROR: No.
"THE COURT: Ma'am?
"A JUROR: No.
"THE COURT: How about you?
"A JUROR: No.
"THE COURT: Ma'am?
"A JUROR: No.
"THE COURT: Ma'am?
"A JUROR: No.
"THE COURT: Well, I'll say now that an objection was made as to the — what the Court's facial expressions — and I don't know what my facial expressions are, so I sustained his objection. But I want to be sure that there hasn't been any prejudicial effect on this Defendant for anything that this Court has said. Has there? Or any —
"A JUROR: No.
"THE COURT: Or any — have I given anybody the impression — has this Court given anyone the impression that the Court was — how did you characterize it?
"MR. BELL: Your Honor, I think that you — excuse me, but I think that you are putting myself and both my client in a precarious situation —
"THE COURT: Well, that's all right, then. Anything that this Court has said, then, or any facial expression or anything else, have I indicated to you directly or indirectly — and sure enough, if you have got any feelings, it would be highly improper for this Court to indicate to you directly or indirectly that the Court has got any feelings about the guilt or innocence of this man.
"A JUROR: (Indicating in a negative manner.)
"THE COURT: I state to you that the Court has not intended to do that. That's your business. And the Court's charge is — and all charges — I am going to tell you like I tell juries every day, that the Court doesn't intend to be your thirteenth juror. Anything I have said, either what I said or how I said it, don't indicate or get any feelings from that. Any indication from either what I said or how I said it, that this Court has got any feelings about what the facts in the case show or what the facts don't show. We have got a government of law and not of men. And it doesn't make any difference at all who is involved. Or anything that I may have said to these lawyers, don't consider that as any feelings that the Court has got about the facts in this case because the Court doesn't — when I sustain an objection, either what I said or how I said it.
"Now, can all of you give this man a fair trial completely on the facts of the case and not based in any degree at all — I haven't intended to give you any impression, but I may have done that unintentionally. And I want to be sure that we cannot give any attention or any reference at all in *Page 502 
your deliberations to what this Court may or may not have said.
"Let me poll the jury again. Sir, can you try the case strictly on the facts and not based on anything I may have said or any way I may have acted?
"A JUROR: Yes.
"THE COURT: Sir?
"A JUROR: Yes.
"THE COURT: Ma'am?
"A JUROR: Yes
"THE COURT: Ma'am?
"A JUROR: Yes, sir.
"THE COURT: Ma'am?
"A JUROR: Yes.
"THE COURT: Ma'am?
"A JUROR: Yes.
"THE COURT: Ma'am?
"A JUROR: Yes.
"THE COURT: Do any of you have the slightest reservation about that? If anybody has got even the slightest reservation, please let them raise their hand.
"All right. Let the record show that all the jurors answered in the affirmative; that is, that they could objectively and even-handed try this case. And of course, let me state for the record and to this jury again that I haven't directly or indirectly intended to convey to this jury anything other than this man is entitled to a complete and a fair trial based strictly and entirely on the evidence coming from that witness stand and that alone. And it may be. I don't know. I don't have a mirror up here and I can't tell what I may have — my facial expression. I know what I have said. But I don't know about facial expressions. And it was completely unintentional.
"I'll say this to the jury, Mr. Bell and Mr. Canfield and the Defendant — that it was completely unintentional about facial expressions. Unfortunately, we can't control that sometimes. I don't have a mirror, and I sustain his objection. If my facial expression displeased somebody, I am sorry. I sustain the objection. And I am telling y'all please don't pay any attention to it. Now, let's move along."
It is the opinion of this court that Allen v. State, 290 Ala. 339, 276 So.2d 583 (1973), is dispositive of this issue. The Supreme Court held in Allen, supra, that "a more detailed description in the record of the alleged gestures, facial expressions, and hand movements involved, and the points during the trial at which they were made, before predicating reversible error on them alone."
Although the trial judge initially may have granted a mistrial, it is clear that he immediately changed his mind and decided to poll the jury upon any possible prejudicial effect his actions may have had upon them. After determining that the jury could in fact give appellant a fair and impartial trial and that his actions had not prejudiced them in any way, he ordered the trial to go forward. "The grant or denial of a mistrial is a matter within the sound discretion of the trial court and will only be disturbed upon a showing of manifest abuse." Roundtree v. State, 461 So.2d 31 (Ala.Cr.App. 1984). It is clear that in this case the trial court's action in polling the jury was entirely proper and to the appellant's benefit. The trial court did not let the jury decide the issue of mistrial, he merely asked them about his actions for an idea of possible prejudice. See Retowsky v. State, 333 So.2d 193
(Ala.Cr.App. 1976).
 II
Appellant contends that the court erred in his definition of a reasonable doubt in his oral charge to the jury. He argues that the trial judge erred when he instructed the jury that a reasonable doubt was a doubt for which a real and substantial reason can be given.
This very question was resolved recently by this court inWilliams v. State, 455 So.2d 210 (Ala.Cr.App. 1984). TheWilliams case involved the very same instruction on reasonable doubt. Judge Bowen stated: *Page 503 
 "While the instruction in this case may be subject to criticism, it is not erroneous in light of the authorities cited above. When read in conjunction with the entire oral charge, the objectionable portions were intended to impress on the jury the distinction between a reasonable doubt and a vague, imaginary, or possible doubt, and do not constitute such error as to require a reversal. `The doubt which requires an acquittal in a criminal case is actual and substantial. It is not any doubt, for some minds indulge doubts on every question which may be suggested, and on which they must act. It is not mere possibility or speculation, for these the imagination creates. It is the doubt the evidence generates; when the jury carefully weighing all the evidence, cannot say they feel an abiding conviction of the defendant's guilt. This is the most frequent definition of a reasonable doubt, and is perhaps as accurate as any which could be given.' Owens v. State, 52 Ala. 400, 404-05 (1875)."
Williams, supra at 212.
Thus, we find no error in the court's oral charge to the jury on this matter.
 III
Appellant argues that the trial court improperly limited cross-examination of State witness Gibson. He specifically argues that the court erred in sustaining objections as to charges pending against Eddie Hart during the cross-examination of Officer Gibson.
Prior to the complained of action by the trial court, Gibson had given testimony that Hart had been convicted and served time for selling marijuana and cocaine. Gibson had previously explained that Hart was a "contract agent" for the ABI, and was paid by the State to make contacts for the purchase of drugs.
Defense counsel was attempting to attack the credibility of Hart, who was not the witness being examined, and who did not testify for the State. The issue of Hart's possible bias and prejudice was already before the jury. Appellant's attempts to elicit further information as to possible bias of a third party
were clearly erroneous and objections to such were, therefore, properly sustained by the trial court.
Appellant further argues that, during the examination of Hart himself, the court erred in sustaining objections to charges pending against him. He argues that such was admissible to show bias and prejudice and credibility of the witness. It should be noted that Hart was not called as a State's witness. He was called by the defense as an adverse witness. Hart's testimony was not crucial to the State's case; in fact, it was merely cumulative of two prior witnesses who did testify for the State. The circumstances of Hart's employment were already before the jury and his credibility questioned. Therefore, the objections were properly sustained.
Moreover, in this instant trial, counsel failed to make an offer of proof and, thus, the issue is not properly before this court for review. Coburn v. State, 424 So.2d 665 (Ala.Cr.App. 1982), cert. denied, 424 So.2d 665 (Ala. 1983); Collins v.State, 364 So.2d 368 (Ala.Cr.App.), cert. denied, 364 So.2d 374
(Ala. 1978).
 IV
Appellant argues that there was insufficient evidence to establish any link between the seller and himself. We do not agree. Appellant was indicted for "selling, furnishing, or giving away" marijuana and cocaine. A review of the record in this cause reveals that the appellant did, in fact, either sell, furnish, or give away marijuana and cocaine to the agents in this cause. The trial court was not in error for not ordering a directed verdict.
 V
Appellant argues that the trial court erred in failing to grant his motion for new trial based on perjured testimony. It should be noted initially that the appellant is arguing that Eddie Hart committed perjury and as a result appellant was *Page 504 
convicted. Hart was called by the defense in this cause.
In order to obtain a new trial on the basis of the use of perjured testimony by the State, a defendant must allege andprove (1) that the testimony was perjured; (2) that it was on a matter of such importance that the truth would have prevented a conviction; (3) that the State had knowledge that the testimony was perjured; and (4) that the defendant was not negligent in discovering the falsehood and in raising the issue. Summers v.State, 366 So.2d 336 (Ala.Cr.App. 1978), cert. denied,366 So.2d 346 (Ala. 1979); Pennington v. State, 420 So.2d 845
(Ala.Cr.App. 1982); Phelps v. State, 439 So.2d 727 (Ala.Cr.App. 1983); Waldrop v. State, 448 So.2d 490 (Ala.Cr.App. 1984). This is in addition to meeting the requirements for establishing the right to a new trial on the basis of newly discovered evidence.Barnes v. State, 415 So.2d 1217 (Ala.Cr.App. 1982).
In the present case the appellant has failed to satisfy his burden of proof. The record reveals that Hart was not a State's witness, although he gave testimony favorable to the State. Defense counsel impeached this witness and showed his bias but has not yet proved that the witness was crucial to the entire State's case.
A review of all the evidence presented on this point does not convince this court that the "new evidence" would change the result of trial and would have prevented a conviction. Hart's testimony was not used by the State to establish the guilt of the appellant. This evidence was properly put before the jury, which had the "responsibility of assessing the credibility of each witness and weighing all the evidence, whether direct or circumstantial, as they viewed it." Cumbo v. State,368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala. 1979).
Moreover, a decision on a motion for new trial rests largely within the discretion of the trial court, and, in reviewing such decision, the appellate court will indulge every presumption in favor of the correctness thereof. Ward v. State,440 So.2d 1227 (Ala.Cr.App. 1983). The trial court properly denied the motion for new trial in this cause.
We have carefully reviewed this record for errors affecting the substantial rights of appellant and have found none therein.
The judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.