The trial court sentenced Richard Frazier to death by electrocution after a jury had convicted him of three counts of capital murder and had recommended that he "be punished by life imprisonment without parole." The Court of Criminal Appeals affirmed the conviction and the sentence. See Frazier v. State,562 So.2d 543 (Ala.Crim.App. 1989). We granted Frazier's petition for a writ of certiorari, pursuant to Rule 39(c), A.R.App.P. We reverse and remand.
Frazier was found guilty of unlawfully, intentionally, and with malice aforethought killing Jesse and Irene Doughty by shooting them with a gun; of feloniously taking approximately $7,000, the property of Mr. Doughty, against his will and by violence to his person, and during the robbery unlawfully, intentionally, and with malice aforethought killing Mr. Doughty by shooting him with a gun; and of unlawfully, intentionally, and with malice aforethought killing Mr. Doughty pursuant to a contract for hire. The robbery and the murders took place in January 1977; Frazier was not indicted for these offenses until November 1985, almost nine years later. The transcript and the briefs reveal no dispute as to the nature of these killings. This was, indeed, murder most foul. The dispute is whether Frazier is the murderer. *Page 562 
The jury found Frazier to be guilty as charged, based upon what the Court of Criminal Appeals described as "testimony of four witnesses whose credibility was highly questionable." There was certainly no lack of charity in this description. One witness who testified against Frazier was serving a life sentence after having been convicted of 15 felonies. Another witness against Frazier had been convicted of 13 burglaries and one misdemeanor. Another witness, Frazier's former common law wife, who had been convicted of forgery three times and of possession of illegal drugs once, made three inconsistent statements about the events that occurred on the night the Doughtys were killed, and she admitted that she was high on heroin that night. These were three of the four witnesses who connected Frazier with the robbery and these murders. During oral argument before this Court, Frazier's attorney appropriately remarked that these three witnesses were hardly "the prom queen, the Archbishop, or the Mayor of Mobile." The credibility of these witnesses was, however, for the jury, who knew of their convictions, the drug problem, and the prior inconsistent statements.
The problem that faces this Court concerns the testimony of the fourth witness, Dickie King, a convicted felon who appeared on behalf of the State at Frazier's trial. Although King's felony conviction reflected upon his credibility as a witness and, thus, was simply a matter to be considered by the jury, King admitted after Frazier's trial that he had perjured himself; and "therein lies the rub." After Frazier was convicted, Lee Jackson, the man who had allegedly hired Frazier to murder Mr. Doughty, was tried. Dickie King was also a witness for the State in the Jackson trial. After defense counsel had begun his cross-examination of King and the court had recessed for the day, the district attorney called King to his office, and, upon questioning by the district attorney or his staff, King admitted that he had lied under oath in the case then being tried and that he had also lied during Frazier's trial.
During Frazier's trial, King testified that he was asked by Jackson if he knew someone who would murder an unnamed person for $5,000; that he found Frazier cutting grass in his brother's yard on Dauphin Island Parkway in the middle of January and asked him if he would commit the murder; that Frazier agreed to do so; and that he instructed Frazier to get in touch with Jackson. King testified that after this conversation he had no other conversation with Jackson or Frazier about the killing. He testified that he received no payment or consideration of any kind for his part in putting Frazier in contact with Jackson. King testified that he had not been involved in any other illegal activities with Jackson. He testified that he did not own a .357 magnum pistol at the time of the murders. He further testified that he did not know why Jackson, who allegedly hired Frazier after the murders to work at Campbell Construction Company, subsequently fired him. During the Jackson trial, King admitted that he owned the .357 magnum pistol that was used to kill the Doughtys. King testified that before the murders were committed, he asked Frazier about the status of the murder of Mr. Doughty and gave Frazier his .357 magnum pistol filled with ammunition, when Frazier told him that he did not have a gun. King further testified that he demanded $1,000 from Frazier for his part in arranging the murder. King admitted having stolen a dump truck, gasoline, fuel, parts, oil, and other materials for Jackson. King further testified that Jackson told him that he had fired Frazier because Frazier had been involved in a knife fight in Birmingham and that he could not have that kind of conduct by an employee. King testified that he had several conversations with Jackson about the Doughty murders after those murders had been committed.
The district attorney nol-prossed the case against Jackson, stating as follows:
 "Last night, for the first time in a year-long investigation, State witness Dickie Lane King admitted to me, my chief trial attorney Lloyd Copeland and my chief investigator, Bob Eddy, that he had not only lied concerning the extent of his involvement in the murders of Jesse and *Page 563 
Irene Doughty, but that he had perjured himself in that regard at least twice. The guilt or innocence of Lee Jackson notwithstanding, it would be both immoral and repugnant [to] our principles of justice to ask this jury to convict Lee Jackson based upon perjurious testimony.
 "My ethics as an attorney and my basic sense of decency will not allow me to proceed. I, therefore, respectfully, but reluctantly, ask this Court to nol-pros this case."
After the case against Jackson was nol-prossed, Grady Lambert, who along with Frazier and Jackson had been indicted in connection with the Doughty murders, was tried without the testimony of King and was acquitted. Admittedly, the first three witnesses described in this opinion provided more evidence to connect Frazier with the robbery and murders than they did to connect Lambert with those offenses. However, Frazier's defense at his trial was that King, in fact, had committed the robbery and the murders and that Frazier had had no involvement in them. Although the changes in King's story do not establish Frazier's innocence, they certainly showed that King had played a far greater role in the killings than had originally been divulged at Frazier's trial. On the strength of this new information, Frazier moved for a new trial. The trial court denied the motion. Frazier contends that the trial court's denial of a new trial was reversible error. We agree.
In its opinion affirming the conviction and death sentence, the Court of Criminal Appeals reasoned, in pertinent part, as follows:
 "The discovery of the perjured testimony given by Dickie King also did not entitle the appellant to a new trial.
 " 'In order to obtain a new trial on the basis of the use of perjured testimony by the State, a defendant must allege and prove (1) that the testimony was perjured; (2) that it was on a matter of such importance that the truth would have prevented a conviction; (3) that the State had knowledge that the testimony was perjured; and (4) that the defendant was not negligent in discovering the falsehood and in raising the issue. [Citations omitted.] This is in addition to meeting the requirements for establishing the right to a new trial on the basis of newly discovered evidence. Barnes v. State, 415 So.2d 1217 (Ala.Crim.App. 1982).'
 "Baker v. State, 477 So.2d 496, 504
(Ala.Crim.App. 1985), cert. denied, 475 U.S. 1029, 106 S.Ct. 1231, 89 L.Ed.2d 340 (1986). (Emphasis in original.)
 "The appellant has not met his burden of proof, because he has neither shown that the State had knowledge that the testimony was perjured nor shown that it was on a matter of such importance that the truth would have prevented a conviction. Dickie King testified at Lee Jackson's trial that the district attorney's office was not aware that he had perjured himself. District Attorney Galanos testified at the appellant's motion for new trial that he did not know that Dickie King had perjured himself in the appellant's trial until the night following his first day of testimony in Jackson's trial. Galanos testified that he became aware of Dickie King's untruthfulness in testifying when Lee Jackson's attorney indicated, through his questioning, that several people had seen Dickie King with a gun around the time of the murders. Immediately after the district attorney's office became aware of the perjury, the court was contacted and Lee Jackson's defense counsel was also informed of the perjury.
 "Although Dickie King perjured himself on a number of aspects concerning the murders, he still maintained that the appellant committed the offenses and, although that testimony shows that Dickie King was actually more involved in the offenses than he originally indicated, none of the perjured testimony concerned the appellant's role in the offenses. Therefore, the perjured testimony would not have affected the appellant's conviction or the jury's finding of his guilt. See Thomas v. State, 539 So.2d 375 (Ala.Crim.App. 1988) ('Here, the excluded evidence *Page 564 
would not have exonerated this appellant. It was merely evidence that [a witness] may have also been present at the victim's house on the night in question and may have also participated in her death. This evidence is in no way inconsistent with the appellant's guilt. In fact, it is more consistent with the appellant's guilt because this evidence placed him at the scene of the crime!'). As in Thomas, King's later testimony actually further supports the appellant's guilt. He has now testified that he personally gave the appellant the murder weapon to use on the victims and that he received money for his participation, not from Lee Jackson, but from the appellant.
 "The appellant argued at trial that Dickie King probably committed the offense. He now argues that the trial court should accept King's recantation of some of his testimony at the appellant's trial and then disbelieve the rest of his testimony concerning the murders, despite King's testimony that the rest of his rendition at appellant's trial was true and correct. Cf. Wadsworth v. State, 507 So.2d 572 (Ala.Crim.App. 1987) (where petitioner in a coram nobis proceeding in effect argued that a witness's testimony against him was perjured because he had made a deal with the authorities in exchange for his testimony and asked the circuit court to believe that recanted testimony, but disbelieve the witness's testimony concerning his participation in the robbery).
 "The appellant argues that the jury's acquittal of Grady Lambert following the revelation of Dickie King's perjury indicates that the jury may likewise have acquitted him. However, as argued by the State, each trial is different and must be distinguished by the evidence presented at each trial which indicates the particular defendant's guilt. In the present case, Diane Frazier, the appellant's own wife, testified that he admitted committing the offenses, as did Dalton Sheffield and Richard Johnson. There was sufficient evidence presented at trial to support the jury's verdict.
 " ' "The discovery, at a time subsequent to the date of the trial, that testimony which was introduced thereat was perjured may not be sufficient to support a granting of the writ or a motion for new trial." ' " Wadsworth v. State, supra, at 575, and cases cited therein. In Smitherman v. State, 521 So.2d 1050
(Ala.Crim.App. 1987), the appellant claimed that he was entitled to a new trial because a former police officer, the primary witness who testified against him, was being investigated concerning improprieties in other drug investigations that were going on at the time when he arranged the marijuana buy from the appellant and when he subsequently testified against the appellant. This court stated that 'it is significant to note that, while [the police officer] was the only eyewitness to involve the defendant in the actual sale of marijuana, he was not the only witness to incriminate him.' In the present case, aside from the testimony of Dickie King, there was evidence of the appellant's guilt from the testimony of Diane Frazier, Richard Johnson, and Dalton Sheffield.
 "Because the record contains no evidence that the prosecutor knowingly used perjured testimony to obtain a conviction or that the perjured testimony was on a matter of such importance that the newly discovered evidence [would have] prevented a conviction, this court cannot find any abuse of discretion by the trial court in denying the appellant's motion for new trial."
Perhaps never before has this Court had the issue of perjured testimony so dramatically and forthrightly presented to it. A witness against Frazier has admitted perjury; the State has acknowledged that witness's perjury and has nol-prossed the murder charge against the man who allegedly hired Frazier to commit the murder, because of this perjury, on the prosecutor's belief that it is "immoral and repugnant [to] . . . principles of justice to ask [a] jury to convict . . . based upon [this perjured] testimony." Yet the State asks us on a direct appeal, as opposed to a collateral *Page 565 
proceeding, to affirm the judgment of the Court of Criminal Appeals and to enforce the sentence of death in spite of that perjured testimony. Can this Court acquiesce in the execution of a man, knowing that the jury that convicted him of three capital offenses had before it the perjured testimony of a material witness for the State — a witness whom the State assured the jury it could believe? Because the answer is so clearly "No," we think that the time is right to revisit the standard by which a motion for new trial alleging perjured testimony is reviewed in this state, and to "settle ourselves, and work and wedge our feet downward through the mud and slush of opinion, and prejudice, and tradition, and delusion, and appearance, . . . till we come to a hard bottom and rocks in place, which we can call reality, and say, This is, and no mistake. . . ."[1]
Both the Alabama and United States Constitutions protect a citizen of this state from being deprived of life or liberty without "due process of law." Const. of Ala. of 1901, Art. I, § 6; U.S. Const., Amend XIV. The phrase "due process of law," although incapable of a precise definition, in its most basic sense encompasses the observation of that degree of fundamental fairness that is essential to our concept of justice. See, generally, 16A Am.Jur.2d Constitutional Law §§ 806-811 (1979); see, also, Pennsylvania v. Finley, 481 U.S. 551,107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); Ake v. Oklahoma, 470 U.S. 68,105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
Both the Alabama and United States Constitutions contain specific provisions aimed at ensuring fundamental fairness within our judicial system. See, e. g., Const. of Ala. of 1901, Art. I, §§ 5 (unreasonable search and seizure; search warrants), 6 (rights of persons in criminal prosecutions generally; self-incrimination; due process of law; right to speedy, public trial; change of venue), 7 (accusation, arrest and detention; punishment limited to laws established prior to offense), 8, as amended by Amendment 37, (proceeding against person by information; grand jury not required in misdemeanor cases; plea of guilty prior to indictment), 9 (double jeopardy; discharge of juries from cases), 11 (right to trial by jury), 12 (prosecutions for libel or for publication of papers investigating official conduct of public officers), 13 (courts to be open; remedies for all injuries; impartiality of justice), 15 (excessive fines; cruel or unusual punishment), 16 (right to bail; excessive bail), 17 (suspension of habeas corpus), and 36 (construction of declaration of rights); U.S. Const., Amend. IV (security from unwarrantable search and seizure), V (rights of accused in criminal proceedings), VI (right to speedy trial, witnesses, etc.), and VIII (bails, fines, punishments). Most of the requirements embodied in the Fourth, Fifth, Sixth, and Eighth Amendments have been expressly held to be applicable to the states through the Fourteenth Amendment (citizenship rights not to be abridged by states). See 16A Am.Jur.2d Constitutional Law §§ 453, 454 (1979). Of particular importance in this case are the Sixth and Fourteenth Amendments to the United States Constitution and Art. I, §§ 6 and 11, of the Constitution of Alabama of 1901. These provisions generally guarantee one accused of a crime in this state the right to have a trial by jury that is fundamentally fair in all respects.
In Estes v. Texas, 381 U.S. 532, 540, 85 S.Ct. 1628, 1631,14 L.Ed.2d 543 (1965), the Supreme Court of the United States noted:
 "Court proceedings are held for the solemn purpose of endeavoring to ascertain the truth which is the sine qua non of a fair trial. Over the centuries Anglo-American courts have devised careful safeguards by rule and otherwise to protect and facilitate the performance of this high function."
Later, in Briscoe v. LaHue, 460 U.S. 325, 335, 103 S.Ct. 1108,1115, 75 L.Ed.2d 96 (1983), the Court, quoting Justice White's concurring opinion in Imbler v. Pachtman, 424 U.S. 409,96 S.Ct. 984, 47 L.Ed.2d 128 (1976), again acknowledged what has been considered elementary since the days of *Page 566 
Blackstone[2] — that "[i]t is precisely the function of a judicial proceeding to determine where the truth lies." The Court in Briscoe further noted that courts, in general, have the ability, pursuant to carefully developed procedures, to separate truth from falsity, and that it is extremely important in both criminal and civil cases to accurately resolve the factual disputes between the parties.460 U.S. at 335, 103 S.Ct. at 1115.
In his excellent treatise on the law of evidence, Professor Wigmore discussed some of the safeguards that have been devised "to protect and facilitate the performance of [the] high function" of ascertaining the truth in a judicial proceeding. See 4 J. Wigmore, Evidence, § 1171 (Chadbourn rev. 1972). Certain rules, characterized by Wigmore as "prophylactic rules" of "auxiliary probative policy," seek "by artificial expedients to remove, before the evidence is introduced, such sources ofdanger and distrust as experience may have shown to lurk within it." 4 Wigmore, supra, § 1172. (Emphasis in original.) These prophylactic rules employ five expedients — the oath, the perjury penalty, public proceedings, the sequestration of witnesses, and prior notice of evidence to the opponent. The purpose behind the rules is to eliminate in advance of trial the dangers inherent in certain kinds of evidence. The prophylactic rules operate in one or both of two slightly different ways. Wigmore explained that the expedients that the rules apply serve either to remove the supposed danger by counteracting its influence in advance (all five of the expedients serve this purpose), or to furnish a means by which it can be discovered and other measures taken to counteract it at the trial (public proceedings, the sequestration of witnesses, and notice of evidence to the opponent serve this purpose). See 6 Wigmore, supra, § 1813.
The oath, which can be traced back to Germanic law and custom, and in this state to § 2301 of the Alabama Code of 1852, now Ala. Code 1975, § 12-21-135, pits a witness's motive to falsify against his fear of divine punishment, and tends to make it less likely that he will bear false witness. The perjury penalty[3] tends to make it less likely that a witness will testify falsely, by adding fear of temporal punishment to that of divine punishment. One of the many purposes for having public trials[4] is to make it less likely that a witness will testify falsely. In this regard, Wigmore states:
 "Subjectively, it produces in the witness's mind a disinclination to falsify; first, by stimulating the instinctive responsibility to public opinion, symbolized in the audience, and ready to scorn a demonstrated liar; and next, by inducing the fear of exposure of subsequent falsities through disclosure by informed persons who may chance to be present or to hear of the testimony from others present. Objectively, it secures the presence of those who by possibility may be able to furnish testimony in chief or to contradict falsifiers and yet may not have been known beforehand to the parties to possess any information."
6 Wigmore, supra, § 1834, at 435-36. The sequestration of witnesses operates to prevent collusion among witnesses and furnishes a means of exposing that collusion if it has already taken place. Finally, notice of evidence to the opponent serves to furnish the opponent, in advance of trial, with knowledge of the proposed evidence and, thus, enables him to prepare to expose false evidence. Such advance notice also serves to deter the opponent from offering evidence that he knows can be shown to be false. See 6 Wigmore, supra, § 1813.
As noted, the "prophylactic rules" discussed by Wigmore operate even before evidence is actually introduced at trial. Of course, other rules of evidence may come into play during the evidentiary phase of a trial, to further facilitate the introduction of reliable information. The purpose of all *Page 567 
of our rules of evidence is succinctly in 29 Am.Jur.2dEvidence § 1 (1967):
 "Generally, it may be said that the term 'evidence' in the legal acceptation of the word imports the means by which any matter of fact the truth of which is submitted to investigation may be established or disproved. A rule of evidence may be defined as a principle which expresses the mode or manner of proving the facts and circumstances upon which a party relies to establish a fact in dispute. The field of evidence embraces those rules of law which determine what testimony is to be admitted or rejected in the trial of a civil action or a criminal prosecution, and what weight is to be given to the evidence which is admitted. The object of all evidence is to inform the trial tribunal of the material facts which are relevant as bearing upon the issue, in order that the truth may be elicited and that a fair determination of the controversy may be reached. Thus, the fundamental basis upon which all rules which govern the admission or exclusion of evidence must rest, if they are to rest upon reason, is their adaptation to the development of the truth of such facts.
 "The law of evidence is a constantly expanding phase of our jurisprudence, and its rules are molded and applied according to the needs of justice, to meet changes made by the progress of society. The application of rules of admissibility and competency of evidence is, to some extent, one of sound policy in the administration of the law. Such rules are not to be rigidly adhered to when to do so would be subversive of the ends for which they were adopted, and they yield to experience which demonstrates their fallacy, or unwisdom. The tendency is to abolish or limit the application of restrictive rules of evidence. However, changes and expansions in the rules of evidence are within the settled bounds of well-established precepts, which have become, through constant application, an integral part of the fabric of our jurisprudence."
Lest the point be missed here, we reiterate that certain rules of evidence were formulated (and will continue to be formulated in the future), and other procedures and safeguards were built into our judicial framework (and will continue to be built into it), to ensure that those individuals who, because of their alleged criminal acts, stand to lose their lives or liberty will receive a fair trial.
The motion for new trial is one of the safety devices incorporated into our judicial framework to afford an individual convicted of a crime the opportunity to show the court that, in spite of all the safeguards in place prior to and during trial, he was not treated fairly. By definition, the motion is "[a] request that the judge set aside the judgment and order a new trial on the basis that the trial was improper or unfair due to specified prejudicial errors that occurred."Black's Law Dictionary (5th ed. 1979).
In the present case, the alleged perjury of a material State's witness was the specified error upon which the request for a new trial was based. Justice Black stated in In reMichael, 326 U.S. 224, 227, 66 S.Ct. 78, 79, 90 L.Ed. 30
(1945), that "[a]ll perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore, it cannot be denied that it tends to defeat the sole ultimate objective of a trial." Irrespective of this fundamental concept, the Court of Criminal Appeals concluded that Frazier was not entitled to a new trial.
In rejecting Frazier's request for a new trial, the Court of Criminal Appeals applied the standard set out in Baker v.State, 477 So.2d 496, 504 (Ala.Crim.App. 1985), cert. denied,475 U.S. 1029, 106 S.Ct. 1231, 89 L.Ed.2d 340 (1986), as follows:
 "In order to obtain a new trial on the basis of the use of perjured testimony by the State, a defendant must allege and prove (1) that the testimony was perjured; (2) that it was on a matter of such importance that the truth would have prevented a conviction; (3) that the State had knowledge that the testimony was perjured; and (4) that the defendant was not negligent in discovering the falsehood and in raising the issue. [Citations omitted.] This is in addition to meeting *Page 568 
the requirements for establishing the right to a new trial on the basis of newly discovered evidence. Barnes v. State, 415 So.2d 1217
(Ala.Crim.App. 1982)." (Emphasis in original.)
In Barnes v. State, 415 So.2d 1217, 1219
(Ala.Crim.App. 1982), the court stated that the following five requirements have to be satisfied before a new trial can be granted on the ground of newly discovered evidence:
 " '(1) That the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching.' "
Initially, it is apparent to us that there are problems with the standard set out in Baker v. State, supra. For instance, under that standard does the movant have to prove that the perjured testimony concerns a "matter of such importance that the truth would have prevented a conviction" (see Baker) or does he have to show that the truth "is such as will probablychange the result if a new trial is granted" (see Barnes)? (Emphasis added.) The standard requires the reviewing court to discern the truth's effect by looking backward to see whether the truth, if it had come out at trial, would have prevented a conviction, and also by looking forward to see whether the truth will probably change the result if a new trial is granted.[5] Also, the requirements that the truth be "material to the issue" and that it not be "merely cumulative" seem to be superfluous, in light of the requirements just mentioned.
It also seems rather odd that there should be one rule that allows the trial court to be the factfinder in a hearing on a motion for new trial, see Isom v. State, 497 So.2d 208
(Ala.Crim.App. 1986), and another rule that, at least on its face, seems to prohibit the trial court from fulfilling that function. The trial court, in ruling on a motion for new trial alleging perjured testimony, is charged with the responsibility of making a factual determination as to whether a witness has committed perjury in a previous trial. The trial court, it has been said, is in the best position to determine the credibility of the new evidence. See Isom, supra. Any evidence that tends to prove that a witness has lied at a previous trial, even a recantation by the witness himself, is impeaching. If the standard were to be applied literally, there would be no relief for one convicted on the strength of perjured testimony.
Also of concern is the requirement that the State have knowledge of the perjured testimony before relief can be granted. This requirement obviously worked its way into the standard as a result of the mindset of the courts that the State should not be allowed to benefit from its knowing use of perjured testimony. However, although the State's culpability in knowingly presenting perjured testimony is certainly relevant in a case where such culpability exists, any standard requiring the denial of a new trial simply because the State did not knowingly present perjured testimony cannot be reconciled with the fundamental fairness requirement of due process.[6]
In the present case, the Court of Criminal Appeals held that Frazier was not entitled to a new trial because he failed to show that the State knowingly presented perjured testimony to secure the conviction and failed to show that King's testimony was on a matter of such importance that the truth would have prevented a conviction. We note here that by requiring Frazier to show that the truth would have prevented *Page 569 
his conviction, the Court of Criminal Appeals placed a burden on him that was virtually insurmountable. We fail to see how such a burden could ever be deemed consistent with due process.
Thus, it appears to us that the standard set out in Baker v.State, supra, is confusing, difficult of application, and, in certain respects, violative of general principles of due process. Accordingly, we hold that that standard is not the proper one to be applied in reviewing a motion for new trial alleging perjured testimony. Baker and other cases that are inconsistent with this holding are hereby expressly overruled to the extent of the inconsistency.
Frazier contends that the standard applied by this Court inWoodard v. State, 251 Ala. 314, 36 So.2d 897 (1948), should have been applied in this case. In Woodard, the defendant moved for a new trial, alleging that he had newly discovered evidence tending to show that one of the State's key witnesses had perjured herself. The trial court denied the motion. This Court reversed, stating as follows:
 "Unquestionably this evidence was discovered since the trial of Woodard and no lack of diligence in connection with its discovery appears. It is certainly material to the issue and is not of a cumulative nature. We think it such that it could change the result upon another trial. As before indicated, the jury which tried Woodard did not have the benefit of this evidence."
251 Ala. at 316, 36 So.2d at 899.
The State, in the present case, argues only that the Court of Criminal Appeals applied the correct standard.
The standard utilized in Woodard is clearer and more concise than the one in Baker v. State, supra. In Woodard, this Court simply looked to see whether perjury had been proved; whether there was any lack of diligence on the defendant's part in connection with its discovery; and whether the perjury was such that the truth could change the result in another trial. However, there are problems with the Woodard standard. One of these problems comes clearly into focus when it is remembered that, in promulgating any standard for reviewing new trial motions alleging perjured testimony, we must strike a proper balance between our interest in preserving the finality of judgments, and, thus, promoting the efficient administration of criminal justice, and our interest in safeguarding the rights of the accused. A careful balancing of these concerns is, in our view, necessary to foster stability and confidence in the judicial system. We fear that the standard utilized in Woodard
(whether the truth could change the result) is too broad andcould overburden the system with new trials in cases involving insubstantial claims. On the other hand, the standard applied by the Court of Criminal Appeals in the instant case, which the State advocates and which we have today rejected, is too restrictive and operates to deny new trials even when the movant has been treated unfairly. As our discussion later in this opinion will show, this case is a prime example of how the application of that standard can lead to an unfair result.
In developing a new standard for reviewing new trial motions alleging perjured testimony, we have reviewed the standards being utilized in our sister states and in the federal courts. For a good discussion of the various standards being used, see Note, I Cannot Tell a Lie: The Standard for New Trial in FalseTestimony Cases, 83 Mich.L.Rev. 1925 (1985). The author of this article, after analyzing the cases and the various policy considerations, suggests a compromise test. Without elaborating on the standard that he proposes, suffice it to say that we find certain aspects of it compelling.
In keeping with our goal of adopting a standard that is clear, concise, and fundamentally fair, and with an eye toward striking the proper balance between our interest in the efficient administration of criminal justice and our interest in safeguarding the rights of the accused, we adopt the following standard, which is to be used in those cases in which a sentence of death has not been imposed: In order to grant a motion for new trial alleging perjured testimony, the trial court must be *Page 570 
reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; 3) that the evidence tending to prove the witness's perjury has been discovered since the trial; and 4) that that evidence could not have been discovered before or during trial by the exercise of due diligence.
In cases like the present one, where the death penalty has been imposed, the "plain error" doctrine, as enunciated in Rule 45A, A.R.App.P., requires the Court of Criminal Appeals to search the record and notice any prejudicial error committed by the trial court and to take appropriate action, even though the defendant's counsel may have failed to preserve the error and raise it for appellate review. See, e.g., Ex parte Johnson,507 So.2d 1351 (Ala. 1986). It follows, therefore, that in death penalty cases, where perjured testimony is given and where there is a significant chance that the jury would have reached a different result had it heard the truth from the witness, attorney oversight or negligence in failing to challenge the testimony during trial cannot be a basis for denying a new trial. For this reason, the following standard should be used in death penalty cases: In order to grant a motion for a new trial alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; and 3) that the movant is not relying on evidence of which he was aware at trial and which he consciously decided not to use to challenge the testimony of the perjured witness.
A few comments concerning these new standards are in order. With regard to both of them, a presumption of correctness will continue to be indulged in favor of the trial court's factual findings, and the trial court's ruling on the motion will be upheld on appeal unless it is clearly erroneous. We believe that the "significant chance" requirement is an improvement over both a standard that might require a new trial in every case and a standard that would deny a new trial to a movant unless he could prove that a different result would have been reached by the jury or probably would be reached by another jury at a subsequent trial. We also think that the standards adopted today better preserve the independent functions of the trial court and the jury by clarifying the rule that the case must go to another jury every time there is a significant chance that the movant did not receive a fair trial. Thus, the danger of the trial court's usurping the jury's function, by guessing what the jury's decision would have been or what another jury's decision probably would be, is reduced. Neither standard retains the requirement that the movant must show prosecutorial misconduct in presenting perjured testimony as a prerequisite to receiving a new trial, and, finally, the new standard applicable in death penalty cases reflects our concern that plain error be corrected.
Applying in the present case the new standard applicable to death penalty cases, we hold that Frazier is entitled to a new trial. There is no reasonable basis upon which to conclude that King did not perjure himself at Frazier's trial. The State concedes this. Likewise, the State does not take issue with Frazier's assertion that King was a material witness. He was. The State does insist that had the jury known the truth, the case against Frazier would have been even stronger because, it argues, the truth concerning King's involvement would have presented a more "believable" story to the jury. The State maintains, in essence, that although King was a material witness, his perjured testimony related only to matters immaterial to the question of Frazier's guilt.[7] The Court *Page 571 
of Criminal Appeals accepted this argument. We think that both the State and the Court of Criminal Appeals have failed to realize that the truth concerning King's role in this whole affair, when considered in relation to all of the other evidence presented in the case, would have been of tremendous benefit to Frazier in presenting his defense at trial. Frazier maintained throughout his trial that he was not guilty. He insisted that King committed the robbery and the murders. The State's case consisted primarily of the testimony of four witnesses.[8] As noted earlier in this opinion, three of those four witnesses were thoroughly impeached at trial. King implicated Frazier, and his testimony that he was simply the middleman tended to add credibility to the testimony of the other three witnesses. The truth concerning King's involvement (i.e., that he owned the murder weapon, that he had previously committed criminal acts at Jackson's request, and that he had had several conversations with Jackson about the Doughty murders after those murders had been committed) would have added credence to Frazier's claim that King, in fact, had committed the robbery and the murders. We conclude that there is a significant chance that if the jury had been afforded the opportunity to consider this new information in conjunction with all of the other evidence introduced at trial,[9] it would have reached a different result. Finally, this is not a case in which the movant relies on evidence of which he was aware at trial and which he consciously decided not to use to challenge the testimony of a State's witness. *Page 572 
Perfection is not demanded of our judicial system, but we must aspire to that perfection. It would be perfidy for this Court not to use its power to require a new trial when perjury has permeated the testimony of a major witness for the State. We must strive to maintain the integrity of our judicial system by promoting the efficient administration of justice, but without impinging on the rights of the accused. In certain cases, such as the present one, fundamental fairness dictates the reversal of a conviction and sentence of death. Our organic law demands that an individual receive a fair trial before he can be put to death for his acts. If it did not, surely there could be no confidence in our judicial system.
Felix Frankfurter, counsel for a presidential commission that investigated the conviction and sentence to death of Tom Mooney for alleged complicity in a bomb explosion that killed ten people at a war preparedness parade in San Francisco, after finding that the conviction had been obtained upon perjured testimony, wrote to President Woodrow Wilson: "War is fought with moral as well as material resources. We are in this war to vindicate the moral claims of unstained processes of law, however slow at times the processes may be. These claims must be tempered by the fire of our own devotion to them at home." M. Parrish, Felix Frankfurter and His Times: The Reform Years
(1982), at 99.
We must not let our awareness of the criminal milieu in which Frazier moved stain the "processes of law." Frazier is entitled to a fair trial. Justice Cardozo wrote in The Nature of theJudicial Process (1921) at 35, that "the sordid controversies of the litigants are the stuff out of which great and shining truths will ultimately be shaped." The one "great and shining truth" that has been shaped from this sordid controversy is that the courts of this state shall strive always to ensure fair treatment to all those who, because of their alleged criminal acts, stand to lose their lives or liberty, regardless of who they may be and regardless of what their alleged offenses may be. Our Constitutions require, and we will insist on, no less.
For the foregoing reasons, the judgment of the Court of Criminal Appeals must be, and it hereby is, reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, JONES, ALMON, SHORES, ADAMS and STEAGALL, JJ., concur.
[1] Henry David Thoreau, Walden, at 121 (Walter J. Black, Inc. 1942).
[2] See 3 W. Blackstone, Commentaries on the Laws of England, at 380.
[3] See Ala. Code 1975, § A-10-101.
[4] See Const. of Ala. 1901, §§ 6 and 13; Ala. Code 1975, §12-21-135.
[5] Whether one looks backward to discern what impact the truth would have had on the jury or forward to discern what impact the truth will probably have on another jury, the basic issue is the same — whether the movant is entitled to a new trial. We think, however, that it would be more logical to draft a standard that simply looks back at the circumstances surrounding the trial to see whether a new trial should be granted.
[6] The State did know of the perjured testimony before Frazier's motion for a new trial was ruled upon, before the case was reviewed by the Court of Criminal Appeals on direct appeal, and before this Court issued its writ of certiorari to the Court of Criminal Appeals.
[7] The State's brief reads, in pertinent part, as follows:
"Regarding the requirement that the matter be of such importance that the truth would have prevented conviction, the defendant failed totally to carry this burden. The matters about which King lied in the defendant's trial concerned King's participation in the killings, not the defendant's. In other words, King's perjury was for the purpose of protecting himself; the defendant's participation in the killings was the same in either of King's versions of the story.
"The defendant's argument is apparently that King's partial recantation of his prior testimony somehow proves that the defendant is not guilty of the crime, despite [the fact] that King has always asserted the defendant's guilt. The trial court should not be forced to accept this version unsupported by any evidence. Cf., Wadsworth v. State, 507 So.2d 572
(Ala.Crim.App. 1987) (in coram nobis petition based on use of perjured testimony, defendant asked court in effect to believe witness's testimony of deal he made with authorities but disbelieve testimony concerning his participating in robbery).
"Moreover, the revelation that King was more involved in the murder for hire would have served to strengthen the State's case. This is true for two separate reasons. First, King's testimony was that he only served as a middleman in setting up the murder of an unknown person and that, while the defendant received five thousand dollars for his part, King did it for free. King also testified that after the killings he was sickened by the defendant's description of the Doughtys' deaths. This self-serving version of the events was attacked by the defendant in closing argument as not worthy of belief and thus a reason for rejecting King's testimony entirely. In addition, in closing argument the defendant's attorney denounced the grant of immunity to King, which was conditioned on King's testifying truthfully and the district attorney's believing that King was only an intermediary in the murders. The clear suggestion to the jury of the defendant's closing argument was that King lied to the prosecution about his involvement to avoid prosecution and continued to lie under oath to maintain his immunity from prosecution. Truthful testimony by King as to his participation would have rendered his testimony more credible, both because it would have presented a more realistic version of the crime and because King himself, by admitting his extensive involvement, would have been more believable. Because King's truthful testimony would have been more worthy of belief, the thrust of the State's case — that the defendant was involved in the murder along with King — would have been strengthened.
"The second reason that the truth would have aided the State in the defendant's trial is that King's truthful testimony would have provided more evidence of the defendant's involvement. King's testimony in the defendant's case was that he told the defendant of the opportunity to make some money by killing someone and then heard the defendant admit and describe the crime afterwards. King's truthful testimony would have shown the defendant's preparation for the killing by obtaining from King the gun to be used. The fact that the defendant gave money to King afterwards would also have proved that the defendant in fact committed the crime that he had prepared for.
"For the above reasons the defendant has failed to satisfy the test for a new trial based on the use of perjured testimony."
[8] The Court of Criminal Appeals noted in its opinion that the State's physical evidence, with the exception of a few bullets, apparently was thrown out by the police department.
[9] We note that, in order to grant a new trial, the trial court did not have to accept King's recantation of some of his testimony given at Frazier's trial and then disbelieve the rest of his testimony concerning the murders. King's recantation of a portion of his trial testimony was sufficient in this case to create a jury question.