AFTER REMAND FROM THE ALABAMA SUPREME COURT
In Rogers v. State, 630 So.2d 88 (Ala. 1992), the Alabama Supreme Court, reversing this Court's decision, held that the trial court properly admitted the evidence of flight and the evidence of the other collateral offenses in the instant case and remanded the cause for proceedings consistent with that opinion. Therefore, we are now addressing the remaining issues raised on appeal.
 I
Appellant Musgrove argues that the admission of Rogers's confession at their consolidated trial requires that the judgment be reversed, because, he says, its admission violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and by Alabama law. See Bruton v. United States, 391 U.S. 123,88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, this court has previously determined in the original opinion that, because both appellants sought to have their cases consolidated for trial, they are now estopped from complaining of any error on those grounds. This court further held that the consolidation was proper. Appellant Musgrove was advised that Rogers's statement would be used as evidence at trial. The prosecutor even advised Musgrove that the testimony concerning Rogers's statement would not be admissible against him in a separate trial.
In the present case, no objection was made at trial on these grounds and, therefore, this alleged violation ofBruton would have to rise to the level of plain error, pursuant to Rule 45A, A.R.App.P. "Plain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings."Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied,464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). This alleged error did not rise to the level of plain error. Not only did the appellant invite any error on this ground by agreeing to the consolidation, Timmons v. State, 487 So.2d 975 (Ala.Cr.App. 1986), but also the record indicates that the trial court instructed the jury, on more than one occasion, that only that evidence admitted against appellant Musgrove could be considered in the determination of his guilt or innocence. The court further specifically instructed the jury that Rogers's confession could not be considered against Musgrove.
Furthermore, although Musgrove complains that the prosecutor's statement during his closing argument concerning this confession was prejudicial error, the record indicates that this remark was made during rebuttal closing argument and was based on the evidence presented at trial. Therefore, there was no error. Evans v. State, 389 So.2d 567, 572 (Ala.Cr.App. 1980), overruled on other grounds, Frazier v. City ofMontgomery, 565 So.2d 1255 (Ala.Cr.App. 1990).
 II
Both appellants argue that their death sentences were obtained in violation of Booth v. Maryland, 482 U.S. 496,107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), as well as in violation of the Eighth and Fourteenth Amendments to the United States Constitution and of Alabama law, because, they argue, the prosecutor made emotional appeals during his closing argument. The appellants cite four arguments made by the prosecutor during his closing argument. The complained-of arguments are as follows:
 "The decision you make should not be an emotional decision — these are emotional things that we talk about, but your decision should be based on what is right, but I know this, I know I saw a little girl for the first time and I called her little girl because she is 19, 20, or 21 years old maybe, I saw her for the first time in my life last February when Jeff was conducting a preliminary hearing and I had some other *Page 1350 
matters to take care of that day and Jeff handled it for me. And afterwards I met Elizabeth Barron, Libby Barron, and I met an angry, scared, unsophisticated little girl from Robinwood who had her husband taken away from her just a scant few months before and was left with a little baby girl who was in her arms when her husband died choking in his own blood. When I met Libby I just didn't know what we could do with this case. I did not know if Libby would be able to control herself to handle the anger she had within her, and she was angry and not just at the people that had done this to her husband, she was angry at everyone; she was angry at everyone and she didn't trust anyone. I told her to trust me. I told her to trust us and we would get through this thing. I told her I made her no guarantees because there aren't any guarantees in life. I told her I would do everything I could do humanly possible, everything I could do to see to it that the men who did this to her husband were brought to justice and for the past year, although I have worked on other cases — I have had to assume my normal duties here at the district attorney's office for the past year — I have worked on this case."
 "After you returned a verdict of guilty today I sat and thought and I listened to people in the courtroom and I watched people and I watched Donnis Musgrove and David Rogers and I just sat and thought. And all I could think of is what a terrible waste, what a terrible waste those two men, they could have been something. They could have been productive citizens; they could have been good people. They made decisions, each of them individual decisions to go a different path. They have hurt not just themselves, they hurt not just Libby Barron and her relatives, not just Mooder Barron, the ill will they have done has spread out like ripples in a pond. The lives that they have affected, the people that they have hurt, because of choices that they've made. These are not crazed teenagers on drugs or on alcohol — both of these men are grown men, 38, 39 years old, and they took a path in life, they took the wrong path."
 "Why impose the death penalty? Can forgiveness be had Libby Barron if she is so disposed at some time in her life and can find it in her heart to forgive those two men? Her daughter, Amber, as she grows older and finds out what happened to her father, at some time in her life may find it within her heart to forgive those men for the loss she suffered. Mooder's mother, back there in the court may some time find it within her heart to forgive those men for the loss she suffered."
 "We all go home tonight, but I tell you now, this is important, this counts, this matters, this matters not just for Libby Barron, not just for Mooder's mother and for his memory, for Amber, or for me or this courtroom, this matters in our society, we must separate the civilized from the uncivilized and that is what I ask you to do — I ask you to separate the civilized from the uncivilized and that is what I ask you to do, I ask you through your sentence of death to say to Donnis Musgrove, to say to David Rogers you have forfeited the right to live with the civilized people of this world."
The appellant made no objections to these comments. Therefore, in order to constitute reversible error, the comments must rise to the level of plain error. Rule 45A, A.R.App.P. See Smith v.State, 588 So.2d 561 (Ala.Cr.App. 1991).
In McWilliams v. State, 640 So.2d 982 (Ala.Cr.App. 1991), this court noted that the United States Supreme Court has overruled the pertinent holding from Booth v. Maryland,490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), and SouthCarolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207,104 L.Ed.2d 876, in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597,115 L.Ed.2d 720 (1991). In Payne v. Tennessee, supra, the United States Supreme Court held:
 "Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing *Page 1351 
authorities. We think the Booth Court was wrong in stating that this kind of evidence leads to the arbitrary imposition of the death penalty. In the majority of cases, and in this case, victim impact evidence serves entirely legitimate purposes. In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief. See Darden v. Wainwright, 477 U.S. 168, 179-183 [106 S.Ct. 2464, 2470-72, 91 L.Ed.2d 144] (1986)."
Payne v. Tennessee, 501 U.S. at 825, 111 S.Ct. at 2608. Pursuant to the United States Supreme Court holding in Payne v.Tennessee, supra, there was no error in the prosecutor's comments.
 III
Both appellants argue that the admission of identification testimony violated their rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under Alabama law. Specifically, both appellants contend that Libby Barron's in-court identification of them was unreliable because of unduly suggestive pretrial procedures. The appellants contend that their photographs, used in the array for pretrial identification, were "out of focus" when compared to the other photographs in the array. The appellants failed to object on this specific ground at trial or in their motion to suppress and raised only the general issue that the pretrial identification was "unduly suggestive" in the motion for new trial. The issue of the photograph's clarity is raised for the first time on appeal and therefore must rise to the level of plain error to require reversal. Rule 45A, A.R.App.P.
The record indicates that a hearing was held on the appellants' motion to suppress any in-court identifications by witnesses because these witnesses were subjected to improper out-of-court identification procedures. At the hearing, a sergeant with the Jefferson County Sheriff's Department testified that he showed Libby Barron, the victim's widow, a set of five photographs and that she selected the appellants' photographs as the men who had killed her husband. Libby Barron also testified to her identification and, during trial, the photographs from the photographic lineup were admitted.
 "Pre-trial identifications are to be set aside on grounds of prejudice only if the pre-trial identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Scott v. State, 479 So.2d 1343 (Ala.Crim.App. 1985). The totality of the circumstances surrounding the out-of-court identification need be analyzed only when the pre-trial procedures used were unnecessarily or impermissibly suggestive. Coleman v. State, 487 So.2d 1380 (Ala.Crim.App. 1986). The fact that witnesses are shown photographs does not establish suggestiveness. Matthews v. State, 401 So.2d 241
(Ala.Crim.App. 1981), cert. denied, 401 So.2d 248
(Ala. 1981)."
Ex parte Stout, 547 So.2d 901, 904 (Ala. 1989).
A review of the photographs contained in the record reveals that the array was not impermissibly suggestive. None of the photographs are of high quality. All of the photographs are color photographs depicting white males of approximately the same age and build. Each photograph has a red background, and the photographs are approximately the same size. The record suggests no impropriety in the out-of-court identification.
 IV
The appellants argue that the trial court's reliance on a presentence investigative report, based partially on an uncounseled interview with the appellants denied them of their rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under Alabama law. Specifically, the appellants allege that because the parole officer's interview with them, outside the presence of counsel, was considered by the trial court, their constitutional rights against self-incrimination and their right to counsel were violated. Both appellants allege that these interviews were conducted without benefit of counsel and without their having been advised of their rights pursuant toMiranda v. Arizona, *Page 1352 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The record indicates that this issue is being raised for the first time on appeal and is therefore reviewed under the plain error doctrine. Rule 45A, A.R.App.P.
The presentence investigative report is not contained in the record; therefore, the appellants' claims that the interview was both uncounseled and that they were not advised of theirMiranda rights, beforehand, cannot be verified. However, even if the appellants' claims are true, there is no error. InKuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), affirmed,577 So.2d 531 (Ala.), cert. denied, ___ U.S. ___,112 S.Ct. 242, 116 L.Ed.2d 197 (1991), the defendant raised this issue. Although the court in Kuenzel held that any error in that case was harmless, because the defendant's statement contained in the presentence report mirrored his testimony given at trial, the court went on to state:
 "We note that in United States v. Jackson, 886 F.2d 838, 842 n. 4 (7th Cir. 1989), the court observed that a federal probation officer did not constitute a person acting on behalf of government prosecutors, and thus held that the admission of custodial statements made by defendant to the probation officer as part of the presentence investigation did not violate the defendant's Fifth Amendment privilege against self-incrimination. Citing Brown v. Butler, 811 F.2d 938 (5th Cir. 1987), and Baumann v. United States, 692 F.2d 565
(9th Cir. 1982), the court also held that 'the Sixth Amendment right to assistance of counsel did not extend to [the defendant's] presentence interview by the federal probation officer.' Jackson, 886 F.2d at 845 (footnote omitted)."
Kuenzel v. State, supra, at 526. Accord, United States v.Woods, 907 F.2d 1540, 1543 (5th Cir. 1990), cert. denied,498 U.S. 1070, 111 S.Ct. 792, 112 L.Ed.2d 854 (1991). Because the probation officer did not constitute a government prosecutor and because the appellants' right to counsel does not extend to the presentence interview, there was no error in the trial court's consideration of the presentence investigative report.
Although the appellants also argue that the presentence investigative report should not have been considered because, they argue, it contained hearsay, this court has held that a presentence report containing hearsay may be considered as long as the information contained therein is relevant to sentencing and the defendant has an opportunity to rebut the information.Thompson v. State, 503 So.2d 871, 880-81 (Ala.Cr.App. 1986), affirmed, 503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872,108 S.Ct. 204, 98 L.Ed.2d 155 (1987); Kuenzel v. State, supra, at 528-29. In the present case, the appellants were afforded the opportunity to rebut statements contained in the presentence investigative report and, in fact, did so.
 V
The appellants argue that prosecutorial misconduct rendered the proceedings fundamentally unfair and deprived them of their Sixth, Eighth, and Fourteenth Amendment rights. Specifically, the appellants claim that the prosecutor improperly argued, during the guilt stage of the trial, that certain defense witnesses lied and that defense counsel failed to expose the lies. They also allege that the prosecutor, during the sentencing phase, improperly argued his own opinion based on his special expertise that the appellants were especially deserving of death. The appellants argue that in invoking his special expertise the prosecutor argued facts not in evidence. The record indicates that the appellants did not object to either of these arguments by the prosecutor during trial; therefore, this argument must be reviewed under the plain error doctrine. Rule 45A, A.R.App.P.
The portion of the prosecutor's guilt stage argument which the appellants claim improperly accuse defense witnesses of lying and defense counsel of failing to expose the lies, was as follows:
 "Well, contrary to what [one defense counsel] told you in his closing argument, I don't think anybody here considers him and [the other defense counsel] two of the most unpopular people or whatever, very competent attorneys, they do a good job, but the job of different attorneys is to *Page 1353 
represent their clients, his client. Nobody else, he didn't represent the State, he doesn't represent anybody but his client and that is as it should be. As [one defense counsel] said in his opening statement to you, 'Isn't it a wonderful thing that we live here in America where we have all of these rights and liberties?" and it is a wonderful thing. They represent their clients; they get up and lied to you and support perjury, no, ma'am, they would not. These two men right here, we know personally and professionally, they would not and did not do anything like that. They don't go around telling people what to testify to, but I want you to look around the courtroom. I want you to look at the friends and relatives and some of them are very nice people. There are lots of people with an interest in this case. . . . Would they [certain witnesses] lie to you? Would they make something up? Well, ladies and gentlemen, yes, they would, yes, sir, they would and they did, they lied to you. You think about the story that they told you and this was really rather fascinating. [Defense counsel] didn't put them up to this, I can assure [you] of that, but when someone comes forward and says, this is what happened, it is not the job of the defense attorney to say, you must be lying, they make decisions to put the person on to testify or don't we? The decision was made. . . . Do you think maybe [two witnesses] weren't particularly candid, honest with you about their relationship with these two individuals right there? Maybe, but I will tell you one thing, if David Phillips accidentally fired a 9 millimeter out there as they said some time in July, late July of 1986, well, I'm the Easter bunny. It never happened, that is what we call perjury, and they perjured themselves, folks, let's call it what it is, they lied under oath right there, those two individuals."
This argument by the prosecutor was a legitimate inference to be drawn from the evidence, because the two named defense witnesses directly contradicted the testimony of one of the State's witnesses. "It is well settled that both the prosecutor and defense counsel have the right to present their impressions from the evidence. E.g., Cross v. State, 536 So.2d 155, 160
(Ala.Cr.App. 1988); Sanders v. State, 423 So.2d 348, 351-52
(Ala.Cr.App. 1982). In closing, counsel 'may examine, collate, sift, and treat the evidence in his own way' and 'may argue every matter of legitimate inference from the evidence.' Watsonv. State, 398 So.2d 320, 328 (Ala.Cr.App. 1980), cert. denied,398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941,101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)." Kitsos v. State, 574 So.2d 979,983 (Ala.Cr.App. 1990). See also Merritt v. State,571 So.2d 409 (Ala.Cr.App. 1990).
Moreover, the appellants' claim — that this prosecutorial comment implied that the defense attorneys suborned perjury — is not supported by the comment. The prosecutor's statements were to the effect that the defense witnesses lied and that defense counsel knew nothing of the lies, but only presented the witnesses pursuant to their proper representation of their clients.
The prosecutorial comment that the appellants cite as an invocation of the prosecutor's expertise to indicate that the appellants should be given the death penalty under the special seriousness of this crime, was as follows:
 "I told [Libby Barron] I made her no guarantees because there aren't any guarantees in life. I told her I would do everything I could do humanly possible, everything I could do to see to it that the men who did this to her husband were brought to justice and for the past year, although I have worked on other cases — I have had to assume my normal duties here at the district attorney's office for the past year — I have worked on this case. I have come to this office on weekends; I have stayed late at night after my son has gone to bed on many occasions. I have made long distance phone calls, I have made local telephone calls, I have flown to Bradenton, Florida, to talk with witnesses, I have had investigators out talking with people, people who weren't witnesses in this case trying to gather information."
"Prosecutors should be allowed wide latitude in their exhortations to the jury." Armstrong *Page 1354 v. State, 516 So.2d 806 (Ala.Cr.App. 1986). "Although counsel may not argue facts which are not in evidence, counsel 'may state or comment on proper inferences from the evidence and may draw conclusions from the evidence based upon his own reasoning.' Sasser v. State, 494 So.2d 857, 859 (Ala.Cr.App. 1986)." Garrick v. State, 589 So.2d 760, 763 (Ala.Cr.App. 1991). While the appellants are technically correct that these facts argued by the prosecutor, concerning his promises to the victim's wife, the prosecutor's family situation, and the amount of work put into preparation of this case, were not facts directly in evidence, they are facts that can be inferred and derived from the evidence and, as previously stated, a prosecutor may properly "argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." Donahoo v. State, 505 So.2d 1067,1072 (Ala.Cr.App. 1986). See also Cross v. State,536 So.2d 155, 160 (Ala.Cr.App. 1988). The prosecutor's comments were not such that the fairness or integrity of the proceedings were affected. Rule 45A, A.R.App.P.
 VI
The appellants argue that their rights pursuant to the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and under Alabama law were violated when the trial court denied their motion for individual voir dire of prospective jurors. The appellants claim that they were entitled to this individual voir dire because of the extensive pretrial publicity. The record indicates that the appellants presented no evidence of pretrial publicity in support of this motion and the record further indicates that no potential jurors, in response to the trial court's question on the subject, indicated that they had heard anything about this case.
 "Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination, and it is within the trial court's discretion whether to allow such a request. Bell v. State, 475 So.2d 601 (Ala.Cr.App. 1984), aff'd, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Raines v. State, 429 So.2d 1104 (Ala.Cr.App.), aff'd, 429 So.2d 1111 (Ala. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). The decision of the trial court in denying individual voir dire examination will not be disturbed absent abuse of that discretion."
Hallford v. State, 548 So.2d 526, 539 (Ala.Cr.App. 1988), affirmed, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945,110 S.Ct. 354, 107 L.Ed.2d 342 (1989). There is no indication in the record that the trial court abused its discretion in failing to allow individual voir dire in this case.
 VII
The appellants argue that the trial court's refusal to permit inquiry into a prospective juror's bias against the appellants denies them their rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under Alabama law. Specifically, the appellants argue that the trial court improperly limited their inquiry into a potential juror's views on the appellants' guilt.
However, the record indicates that during the individual questioning of this potential juror, defense counsel was allowed to make extensive inquiry. The trial court never limited defense counsel's questioning and only injected a comment into the voir dire after the prosecutor objected to defense counsel's questioning concerning how the potential juror would vote before the introduction of any evidence. The prosecutor objected on the grounds that the presumption of innocence had not been explained to the potential jurors, and the trial court stated, "I think she would be able to base her verdict on the evidence whether guilty or not guilty, is that correct?" The trial court thereafter instructed the potential juror on the presumption of innocence. One of the defense attorneys then stated that he would like to ask another question, and the trial court responded, "Go ahead." The following then transpired:
 "[DEFENSE COUNSEL]: I'm not trying to belabor the point, but let me ask you this, [potential juror]: Do you feel like after you have heard all of the evidence or *Page 1355 
even before that if you had some doubt arising out of the evidence —
"[PROSECUTOR]: Judge, I object.
"THE COURT: Let him finish the question.
 "[DEFENSE COUNSEL]: Let me finish my question and I will let you state your objection. Do you feel like my client over here would have to come forward in some way and prove to you that he is not guilty?
"[POTENTIAL JUROR]: No.
 "[PROSECUTOR]: I object first of all because it was misstated, it is a reasonable doubt, not a doubt, a reasonable doubt.
"THE COURT: Make it a reasonable doubt then.
 "[DEFENSE COUNSEL]: Do you want me to restate the whole question again?
"THE COURT: Just make it a reasonable doubt.
 "[DEFENSE COUNSEL]: If you had some reasonable doubt arising out of the evidence or lack of the evidence the State presented, would you in order to return a verdict of not guilty, would you feel like my client would have to come forward and convince you that he wasn't guilty?
"[POTENTIAL JUROR]: No.
 "[DEFENSE COUNSEL]: You would make the State live up to their burden and let them meet their test?
"[POTENTIAL JUROR]: Yes.
"[DEFENSE COUNSEL]: Thank you, [potential juror].
". . . .
 "[DEFENSE COUNSEL]: Judge, I would object, that is the test and I think the court's charge will be that a reasonable doubt is a doubt arising out of the evidence or lack of the evidence.
 "THE COURT: Well, going into the question would you vote not guilty or guilty right now, that is a moot question because right now it wouldn't get to the jury.
 "[DEFENSE COUNSEL]: Well, it's not a moot question, it goes to a juror's ability to understand and follow the Court's instructions.
 "[PROSECUTOR]: Judge, they don't understand what [defense counsel] is talking about, they presume they are going to hear something and that is what is confusing them is [defense counsel]'s questions.
"THE COURT: I don't know that any juror —
 [DEFENSE COUNSEL]: [A potential juror] was confused.
 "THE COURT: I've heard that question asked hundreds of times and I dare say that only on one or two occasions have I ever had a juror understand exactly what was meant by it, so it is a confusing question to jurors unless I sit down and explain it to them."
There is no indication in the record that defense counsel was limited in any respect in his ability to cross-examine this potential juror on voir dire. Furthermore, despite the appellants' allegation to the contrary, there is no indication that the trial court in any way attempted to limit future examination of other potential jurors. A review of the record indicates that the potential juror was confused as to the meaning of defense counsel's questions and the trial court took part in the questioning only to help explain the basis for defense counsel's question. The trial court has broad discretion in determining how voir dire examination of potential jurors is to be conducted and a reversal on this ground can only be predicated upon abuse of that discretion.Ervin v. State, 399 So.2d 894 (Ala.Cr.App.), cert. denied,399 So.2d 899 (Ala. 1981). There is no indication in the record that the trial court abused its discretion.
 VIII
The appellants argue that the trial court improperly struck two prospective jurors for cause in violation of the appellants' rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under Alabama law. The appellants argue that two potential jurors were improperly struck for cause under Witherspoon v. Illinois,391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Wainwrightv. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). However, the record indicates that one of the potential jurors cited by the appellants was not struck for *Page 1356 
cause, but in fact remained on the first panel of potential jurors from which the attorneys struck the final jury.
The other potential juror cited by the appellants was properly struck because of her fixed opinion in opposition to the death penalty. The following transpired during the individual questioning of this potential juror concerning her views towards the death penalty:
 "THE COURT: . . . I will ask you 'Do you have a fixed opinion either in favor of or in opposition to capital punishment?'
 "[POTENTIAL JUROR]: Well, this is the main thing: I don't want to do nothing that I can't live with my conscience.
 "THE COURT: I understand that. I absolutely understand that.
 "[POTENTIAL JUROR]: Taking a man's life, and you have a life, you know when the good Lord calls you you have to give an account of these things, you want to be sure about it, but I do believe in prison.
 "THE COURT: Let me ask you this: Is your opposition to capital punishment so fixed and so strong that no matter what the circumstances are in any given case that you know that if you were a juror in the case that you know that you would never under any circumstances be able to vote to impose capital punishment?
 "[POTENTIAL JUROR]: Well, it is kind of hard to say. If you see a thing with your own eyes and you are going to change, you know —
 "THE COURT: Do you think there are circumstances or offenses that do warrant the imposition of capital punishment? In other words, do you think there are people that deserve capital punishment as a form of punishment?
 "[POTENTIAL JUROR]: Well, I still say I believe in just sentence for life, but I don't believe in letting them out, if you're sentenced to life you are in jail until the good Lord calls you home, that is the way I see it.
 "THE COURT: Let me ask you this: If you were a member of this jury, and of course, the ultimate [or] first question would be the question of innocence or guilt, that is, the jury would be called upon to make that determination, if there was a finding that the two defendants — either or both — were not guilty, of course they would be discharged and there would be no question about punishment. If, however, there was a finding of guilty of what is known as a capital offense then the jury would be called upon and instructed to recommend to the Court which punishment they felt most appropriate and any additional instructions I would give to you. Your alternatives as far as punishment would be one of two, the highest form of punishment would be death by electrocution, the next or alternate form of punishment would be life in the penitentiary without provisions for parole. Given those two choices, are there any circumstances that you can imagine where you know that you would be able to if you felt appropriate under the laws and the evidence that you could vote to impose capital punishment?
 "[POTENTIAL JUROR]: I still say give him life without parole.
 "THE COURT: Would you ever be able to vote for capital punishment in opposition to life in the penitentiary without provision for parole?
 "[POTENTIAL JUROR]: I can't say, I just got my conscience, I have to live with [it].
 "THE COURT: I understand that. And these are difficult questions and questions we have to ask on occasions like this. Do you feel you would ever be able to vote and consider capital punishment if you felt that was the appropriate sentence?
 "[POTENTIAL JUROR]: I still — if I saw it with my own eyes but I still if a man's gone, and the Lord is going to pay him. He has to live — you have to live with your conscience and die, and I don't want to be on my death bed saying, 'Lord, forgive me for what I did,' and I can't get forgiven because the man I went against is dead.
 "THE COURT: Would you be able to do so if you were called upon as a juror to do that given those two choices?
 "[POTENTIAL JUROR]: Sure, I would give two choices, my choice would be life time in prison, hard labor, no parole. *Page 1357 
 "THE COURT: Would you say that would always be your choice?
 "[POTENTIAL JUROR]: That would always be my choice.
". . . .
 "[DEFENSE COUNSEL]: . . . In response to the Judge's questions you kept responding if I can recall exactly what you said about you would prefer life without parole. Let me ask you this: Could you follow the Court's instructions on the law if you were a juror in this case?
"[POTENTIAL JUROR]: I would try to do my best.
 "[DEFENSE COUNSEL]: You wouldn't disregard the Court's instructions?
"[POTENTIAL JUROR]: No, I wouldn't do that.
 "[DEFENSE COUNSEL]: And the Judge is supposed to be fair — a Judge is the referee in this thing, he is fair to both sides, he doesn't have an opinion one way or the other. He may have opinions about the law that he may not agree with but yet as a judge he has a responsibility to follow that. As a juror, of course, you have the responsibility to be impartial too and a responsibility to follow the law that the Court gives you. Are you telling us that regardless of what you determine the facts to be and regardless of what the Judge told you the law would be that if you felt like those instructions warranted imposing the death penalty that you would not follow them?
"[POTENTIAL JUROR]: The electric chair?
"[DEFENSE COUNSEL]: Yes, ma'am.
 "[POTENTIAL JUROR]: I want to carry out the Court's order, but I definitely don't want my conscience —
 "[DEFENSE COUNSEL]: I don't think any one of us wants to deal with that, but somebody has to deal with it and that is what we are really asking is, that is what we are really asking. I know it is a difficult question because you haven't heard anything yet, that is what we're asking you, if you feel like based on the Court's instructions and the facts as you determine them to be that the death penalty is warranted, can you do that?
 "[POTENTIAL JUROR]: Are you sure that he is for that? You know?
 "[DEFENSE COUNSEL]: No, ma'am, we say they didn't do it, and we think that evidence will show that. None of us knows what is going to happen at this point, what we're asking you is in the event we ever get to that point, we may never get to it, but in the event that we do what we're trying — we don't want somebody on this jury that is prejudiced for the death penalty or prejudiced against the death penalty, we want someone that will follow the law and apply it to the best of their ability, that is what we are trying to find out, you would just not arbitrarily dismiss capital punishment?
"[POTENTIAL JUROR]: No, I wouldn't do that.
 "[DEFENSE COUNSEL]: And you would follow whatever instructions that Court gave you in respect to capital punishment as well as the other options, couldn't you?
"[POTENTIAL JUROR]: Yes.
 "[DEFENSE COUNSEL]: That's all we are asking. Thank you, [potential juror].
 "THE COURT: Let me ask this question: Concerning the instructions given by the Court, I know you want to follow the Court's instructions. I would never instruct you as to which punishment was appropriate because I would be invading the province of the jury, that is the jury's job. The instructions that I would give you are that you would have the two choices, one being capital punishment and there would be instructions as to how you would consider capital punishment. The other being life in the penitentiary without provision for parole. Now, my instructions would be that you would vote as to whichever punishment you felt most appropriate under the evidence that you had heard and the law as I would give it to you. If you felt that under the instructions that I had given to you and the evidence that you had heard that capital punishment was the appropriate sentence, would you be able to recommend to the Court capital punishment *Page 1358 
or would you go back and always consider life in the penitentiary without provision for parole?
 "[POTENTIAL JUROR]: I think I would go back to life imprisonment without parole.
"THE COURT: All right."
In determining whether a veniremember's views might prevent or "substantially impair the performance of his duties as a juror," Wainwright v. Witt, 469 U.S. 412, 433, 105 S.Ct. 844,857, 83 L.Ed.2d 841 (1985), a trial court is aided by being able to observe the potential juror's demeanor and tone in responding. There is no special phrase that will resolve the indecisiveness of a potential juror's responses. Watkins v.State, 509 So.2d 1071, 1073 (Ala.Cr.App.), affirmed,509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269,98 L.Ed.2d 226 (1987). See also Brownlee v. State, 545 So.2d 151
(Ala.Cr.App. 1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989). In the present case, this potential juror was properly struck for cause.
 IX
The appellants argue that the allegedly unnecessary and highly prejudicial use of uniformed guards sitting behind them at the defense table violated their Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution. However, there is no indication in the record that any guard sat behind the appellants, nor were any objections raised by the appellants on this ground. "[T]his court cannot predicate error on matters not shown by the record, nor can we presume error from a silent record.Smelcher v. State, 520 So.2d 229 (Ala.Cr.App. 1987); Abbott v.State, 494 So.2d 789 (Ala.Cr.App. 1986). 'Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.' Jolly v. State,405 So.2d 76 (Ala.Cr.App. 1981); Watson v. State, 398 So.2d 320
(Ala.Cr.App. 1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."Owens v. State, 597 So.2d 734, 736 (Ala.Cr.App. 1992).
Moreover, even if guards had been present behind the appellants, in view of the nature of this crime and the facts of this case, it was not error for the guards to sit near the appellants. See Goodwin v. State, 495 So.2d 731, 732-33
(Ala.Cr.App. 1986).
 X
The appellants argue that the prosecutor made "repeated" adverse comments on their decision not to testify, which denied them their rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The appellants cite to the following comment made by the prosecutor during the State's rebuttal closing argument:
 "[PROSECUTOR]: The evidence I state to you in argument, ladies and gentlemen, shows that they are murderers. And there is no honor. Now, the case is going to be yours. What did you hear from the defense?
 "[DEFENSE COUNSEL]: And I'm going to object on the grounds of both the Alabama Constitution and the U.S. Constitution based on [prosecutor]'s comments and respectfully ask for a mistrial.
 "THE COURT: I will have to rule on that at the end of the closing argument.
 "[DEFENSE COUNSEL]: Judge, we are asking for a mistrial on his unconstitutional statements on both the Alabama and U.S. Constitution.
 "THE COURT: At this point in time, I will have to take it under advisement.
 "[PROSECUTOR]: What did you hear from the Defendant?
 "[DEFENSE COUNSEL]: Again, I'm going to object on both the constitution of the Alabama and the U.S. Constitution and —
 "[OTHER DEFENSE COUNSEL]: And we would like a continuing objection and —
"[DEFENSE COUNSEL]: And ask for a mistrial.
 "THE COURT: I will take it under advisement at this time.
 "[PROSECUTOR]: Think about that last question and the answer is what you heard. Adolph Hitler and six million Jews. You heard [defense counsel] talk about the *Page 1359 
electric chair in his opening statement. Opening statement is supposed to be for the purpose of outlining what you expect the evidence to show. When you hear [defense counsel] talking about the electric chair and Adolph Hitler killing six million Jews and that is right after he talked about the State letting the guilty party go free, they are not interested in the truth, just in getting a conviction, etcetera, etcetera, etcetera. . . ."
The trial court subsequently overruled these objections and stated that it would instruct the jury on the matter at the end of its oral charge. The appellants again raised this issue in their motion for new trial and the trial court responded, stating:
 "The Court in considering [this issue] reviewed the notes concerning what was said at the summation by the prosecutor and sustains its prior ruling made at trial, that the statement made by the prosecutor was not a comment on the failure of the defendants to testify, but was a comment on what evidence was presented by the defense for each side, which is a permissible comment on the testimony in evidence; therefore, the motion for a new trial as set out [as to this issue] is hereby denied."
The prosecutor's statement, "What did you hear from the defendant?" when viewed in the context of the entire argument, did not refer to the appellants' failure to testify, but was rather the prosecutor's opening into a summary of the case presented by the defense. The comment was clearly not a direct reference to the appellants' failure to testify because it was not " 'manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify.' " Ex parteWilson, 571 So.2d 1251, 1261 (Ala. 1990), quoting Marsden v.Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied,488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988). Nor was this comment an indirect reference to the appellants' failure to testify and there was no "close identification" of the appellants as the exact people who did not become witnesses. Exparte Wilson, supra, at 1261. This statement by the prosecutor was merely a general opening statement to a recapitulation of the defense's case.
 XI
The appellants argue that allegedly false testimony, which was material to the return of the guilty verdicts at the guilt phase, was offered and that they are therefore entitled to a new trial. However, the appellants are not entitled to a new trial on this ground because they have proved neither that the cited testimony was false nor that there is a significant possibility that, had the jury heard the truth, a different result would have been reached. Ex parte Frazier,562 So.2d 560, 570 (Ala. 1989).
The record indicates that the appellants presented an alibi defense through the testimony of two witnesses who stated that they were in Bradenton, Florida, from August 28, 1986, until October 6, 1986, with the appellants. In rebuttal, the State presented the testimony of a witness who stated that in September 1986, he lived in Smyrna, Georgia, and that he last recalled having seen his wallet and its contents in the glove compartment of his 1986 Oldsmobile automobile on Sunday, September 28, 1986, which was parked in front of his apartment. The witness also identified his wallet, which was recovered from appellant Rogers's possession at the time of his arrest. At the hearing on the motion for a new trial, the defense introduced a copy of the incident report from the Smyrna Police Department, reporting the theft of the Oldsmobile and indicating that it was reported stolen on September 29, 1986. However, this evidence does not prove that the testimony of the State's witness, that he last saw his automobile on September 28, 1986, was false. Moreover, the State, during the hearing on the motion for a new trial, introduced a letter from an employee of an insurance company, stating that the State's witness reported his Oldsmobile stolen on September 29, 1986. Thus, the appellants failed to prove that the witness testified falsely or that, had the jury heard the truth, there is a significant chance that it would have reached a different result.
 "[T]he following standard should be used in death penalty cases: In order to grant a *Page 1360 
motion for new trial alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; and 3) that the movant is not relying on evidence of which he was aware at trial and which he conscientiously decided not to use to challenge the testimony of the perjured witness.
 ". . . [A] presumption of correctness will continue to be indulged in favor of the trial court's factual findings, and the trial court's ruling on the motion will be upheld on appeal unless it is clearly erroneous."
Ex parte Frazier, supra, at 570. In the present case, the pertinent testimony was not perjured, and the trial court properly denied the appellants' motion for new trial.
 XII
In accordance with § 13A-5-53, Code of Alabama 1975, we have reviewed the record, including the record of both the guilt and sentencing proceedings, for any error which adversely affected the rights of the appellant, and we have found none. Rule 45A, A.R.App.P. Nor do we find any evidence that the sentence was imposed under influence of passion, prejudice, or any other arbitrary factor.
The trial court properly found the existence of three aggravating circumstances: that the crime was committed during a burglary in the first degree; that the appellants had previously been convicted of a felony involving the use or threat of violence to the person; and that the capital offense was committed while the appellants were under a sentence of imprisonment. The trial court found the existence of no statutory mitigating circumstances and little nonstatutory mitigating circumstances concerning the appellants' character and relationships.
After an independent weighing of the aggravating and mitigating circumstances in this case, we find that the evidence supports the trial court's conclusion and indicates that death was the proper sentence. The sentence of death in this case is neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and the defendants. See, e.g., White v. State, 587 So.2d 1218
(Ala.Cr.App. 1990), affirmed, 587 So.2d 1236 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992);Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App. 1984); affirmed,472 So.2d 1106 (Ala.); cert. denied, 474 U.S. 975,106 S.Ct. 340, 88 L.Ed.2d 325 (1985); Grayson v. State, 479 So.2d 69
(Ala.Cr.App. 1984), affirmed, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).
Because the appellants' convictions and sentences of death are proper, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.